E. Ross BUCKLEY, Appellant,

v.

The NEW YORK TIMES COMPANY, Appellee.

E. Ross BUCKLEY, Appellant,

v.

The COMMERCIAL APPEAL, Appellee.

E. Ross BUCKLEY, Appellant,

v.

The NEW YORK HERALD TRIBUNE, Appellee.

E. Ross BUCKLEY, Appellant,

v.

The CINCINNATI POST AND TIMES STAR, Appellee.

E. Ross BUCKLEY, Appellant,

v.

The CHARLESTON GAZETTE, Appellee.

E. Ross BUCKLEY, Appellant,

v.

DES MOINES TOWN REGISTER, Appellee.

E. Ross BUCKLEY, Appellant,

v.

The FLORIDA TIMES–UNION, Appellee.

Nos. 20452, 20717, 20851–20853, 20514, 20716.

United States Court of Appeals Fifth Circuit.

Oct. 26, 1964.

Rehearing Denied Dec. 4, 1964.

John R. Brown, Circuit Judge, dissented in part.

Gibson Tucker, Jr., New Orleans, La., Tucker & Schonekas, New Orleans, La., for appellant.

R. Emmett Kerrigan, Thomas F. Daly, Deutsch, Kerrigan & Stiles, New Orleans, La., Lord, Day & Lord, New York City, Armistead F. Clay, Memphis, Tenn., E. Douglas Hamilton, New York City, John F. Novatney, Jr., Rocky River, Ohio, F. Paul Chambers, Charleston, W. Va., Raymond T. Jackson, Cleveland, Ohio, for New York Times Co. and others.

George V. Baus, New Orleans, La., for Des Moines Town Register.

Harold B. Wahl, Jacksonville, Fla., for Florida Times-Union.

Before BROWN and WISDOM, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge.

These consolidated libel actions for damages are all based on an Associated Press story which stated that the Roman Catholic Archbishop of New Orleans had threatened excommunication by personal letters to Catholics seated on the platform of a militantly segregationist White Citizens Council meeting in New Orleans; that Buckley, then the Republican candidate for Mayor of New Orleans, was on the platform, but denied receiving such a letter.[1]

1. The article as published by the Des Moines Register on April 2, 1962, is typical:

"WOULD EXCOMMUNICATE CATHOLIC INTEGRATION FOES.

"New Orleans, La.—The Roman Catholic Archbishop of New Orleans has threatened several leading segregationists here with excommunication, a high church official disclosed Sunday.

"Personal letters, this source said, went to each Catholic on the platform Friday during a meeting of the militantly segregationist White Citizens Council.

"On the platform then were E. Ross Buckley, Republican candidate for mayor, and Leander Perez, political boss of St. Bernard and Plaquemines Parishes (counties).

"Buckley said he had received no such letter. Perez was out of the city.

"Confirmation of the stern action by Archbishop Joseph Francis Rummel came after Mrs. B. J. Gaillot, Jr., president of Save Our Nation, Inc., told the Associated Press she had been so threatened.

"Mrs. Gaillot and members of her group picketed the residence of Archbishop-Coadjutor John Patrick Cody after an announcement last Tuesday that schools in the archdiocese would be desegregated next fall.

"Asked why she thought the church was contemplating taking extreme action against her, Mrs. Gaillot said, 'I am assuming because of my stand on segregation.'

"She said she received the letter late Saturday night via registered mail.

"Emile A. Wagner, Jr., attorney and staunch segregationist who opposed integration of public schools here in 1960, said he refused to accept a letter from the archdiocese Saturday night.

"'I have heard it contained such a threat (of excommunication),' Wagner said. 'I wouldn't be surprised if it (the letter) were a threat of moral bludgeon

Federal jurisdiction in each case was based on diversity of citizenship, and since none of the defendants had qualified to do business in Louisiana, service was accomplished under the substituted service provision of Louisiana law, which allows such service of process upon a foreign corporation not qualified to do business but doing business in the State, in an action arising out of such business activity.[2] In each case the newspaper company filed a motion to quash the service and have the action dismissed. In each case the District Court quashed the service and dismissed the action; all of the decisions were based, generally, upon the finding by the District Court[3] that the defendants were not "doing business"

within the State to a degree sufficient to subject them to substituted service under the Louisiana statute.

The parties argue several questions, such as: Was the service proper under the Louisiana statute? Must the business engaged in be connected with the wrong alleged? Does Louisiana follow the "single publication rule"? and Did the newspaper companies have sufficient contact with the forum state to an extent that Louisiana's exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment? It is apparent that the Louisiana statute is intended to go the permissible limits of due process in ex-

to prevent anyone from taking a position from what is being done here.'

"Mrs. Gaillot's organization contends Biblical teachings prove 'God demands segregation.'

"The organization's pickets Tuesday carried signs saying: 'Archbishop Cody: Will you answer to Christ your sins if we mix?'

" 'The high priests made the same mistake. They repented. Will You?'

" 'Rebecca chose death rather than see her son integrate.'

"Mrs. Gaillot, mother of three, said she would not stop demonstrating until she has a personal interview with Archbishop Rummel. She declined to disclose the number in her organization, but said she is a descendant of seven generations of Louisiana Catholics.

"Wagner, an attorney, some years ago opposed Rummel's declaration that segregation was 'morally wrong and sinful.'

"Wagner asked for a ruling from the Pope. None was forthcoming.

"Since then, Wagner has made anti-integration speeches before the Citizens Council.

"Excommunication casts out Catholics from the communion of the church."

2. LSA–R.S. 13:3471(1)—"The following rules supplement those governing the service of citation and other legal process in a civil action or proceeding contained in the Code of Civil Procedure:

"(1) If the foreign corporation is not one required by law to appoint an agent for the service of process, but has engaged in a business activity in this state, service of process in an action or proceeding on a cause of action resulting from such business activity in this state,

or for any taxes due or other obligations arising therefrom, may be made on any employee or agent of the corporation of suitable age and discretion found in the state. If such employees or agents are no longer in the state, or cannot be found after diligent effort, the officer charged with the duty of making the service shall make his return to the court, stating the efforts made by him to secure service and the reason why he was unable to do so. Thereupon the court shall order that service shall be made on the secretary of state, or on some other individual in his office whom the secretary of state may designate to receive service of process. The secretary of state shall ascertain the domiciliary post office address of the corporation, and shall send the original papers served to the corporation by registered mail, with return receipt requested. The secretary of state shall retain in his office true copies of these papers, on which he shall note the date, the manner and other particulars of the service, and of the disposition made of the original papers."

3. Chief Judge Herbert W. Christenberry rendered the decision in the cases against The New York Herald Tribune, The Cincinnati Post and Times Star and The Charleston Gazette; Judge Frank B. Ellis rendered the decision in the cases against The Florida Times-Union, The Commercial Appeal and The New York Times Company; Judge Robert A. Ainsworth, Jr., rendered the decision in the case against the Des Moines Town Register. See Buckley v. Des Moines Town Register, D. C., 215 F.Supp. 628, and Buckley v. New York Times Co., D. C., 215 F.Supp. 893.

ercising this jurisdiction *in personam* over foreign corporations allowed by International Shoe Co. v. Washington, (1945), 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; Perkins v. Benguet Consolidated Mining Co., (1952), 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485; McGee v. International Life Ins. Co., (1957), 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; and Hanson v. Denckla, (1958), 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283. In this connection see Stanga v. McCormick Shipping Corporation, (5th Cir. 1959), 268 F.2d 544. It is not necessary, therefore, for this Court, under the requirements of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to ascertain whether the State law was intended to encompass the challenged service. For the reasons hereinafter appearing, the only question necessary for this Court to decide in these cases is whether the activities of the newspaper companies were sufficient to constitute "minimum contact" within the meaning of the rule. Since this is a fact question, it is necessary to examine the business activities of each defendant within Louisiana at the time of the attempted service.[4]

The New York Herald Tribune, a corporation, has no office, place of business, officers, agents or employees in Louisiana; it has no agent for service of process; it is not listed in any telephone directory, and has no assets within the State of Louisiana. The corporation publishes a daily paper, which is edited, published, printed and principally circulated in the State of New York. The only copies of the paper sold at newsstands in Louisiana are sold through independent distributors pursuant to arrangements made in New York. There are no subscriptions solicited from Louisiana residents; however, copies of the paper are sent directly by mail to Louisiana residents under subscriptions applied for in New York. For the years 1960, 1961 and 1962, there was a daily circulation of newspapers by this corporation through the mail in Louisiana of 43, 34 and 40, respectively; of the total circulation, the Louisiana percentage for the same years was .00012%, .00009% and .00011%, respectively. This corporation has no regular reporters and rarely sent reporters into Louisiana. The corporation has no advertising salesmen in Louisiana, and the total advertising from Louisiana for each of the same years referred to above as it relates to the total linage was approximately .0001%.

The Charleston Gazette, published and circulated principally in West Virginia, has no office, place of business, assets, agents or employees in the State of Louisiana; no subscription solicitation is made of Louisiana residents. The subscriptions from residents of Louisiana (five in April of 1962 and three in July, 1963) resulted from unsolicited orders sent to and accepted in West Virginia. One copy of the paper was sold in Louisiana on April 2, 1962—the date of the alleged libel—by an independent distributor.

The Cincinnati Post and Times Star is published by the E. W. Scripps Company in Ohio; it is principally circulated in the State of Ohio; an average of thirteen copies of this paper was circulated to Louisiana residents in 1962, these copies having been mailed directly from Ohio in response to unsolicited orders sent to and accepted by the company in Ohio.

The New York Times Company is edited and published in New York and is sent directly to subscribers and independent distributors from New York. The Times Company has no office or resident agents or employees in Louisiana of any kind. The only connections of the Times Company with Louisiana are: the sending of less than a thousandth of one per cent, in the aggregate, of its newspapers from New York to subscribers and to independent distributors in Louisiana; the occasional solicitation of advertising (an amount less than one thousandth of one per cent, in the aggregate) by travel-

---

4. This same procedure was found necessary by this Court recently in Walker v. Savell and The Associated Press, 5 Cir., August 11, 1964, 335 F.2d 536.

ing representatives; two such trips were made in 1960, three in 1961 and four in 1962; and the occasional sending of staff reporters to Louisiana on special assignments (there are no regular Times reporters in Louisiana); this occurred eight times in 1960, twice in 1961 and eleven times in 1962.

The Commercial Appeal, published by the Memphis Publishing Company, a Delaware corporation, has no office, place of business, assets, officers, agents or employees in Louisiana. The newspaper is edited, published and principally circulated in the State of Tennessee. No agents or employees of this company solicit subscriptions from Louisiana residents. The small percentage of its papers that is distributed in Louisiana (approximately nine one hundredths of one per cent) results from unsolicited applications sent to and accepted by the company in Tennessee. The Commercial Appeal has no advertising agents in and does not solicit advertising in Louisiana. On an average of three or four times each year the company sends reporters to Louisiana on special assignments, principally to cover sporting events.

The Florida Times-Union is edited, published and principally distributed in Jacksonville, Florida. During the years 1960–62, this newspaper had an average of ten subscribers in Louisiana who received the Sunday edition and seven who received the daily edition. All of these subscriptions were acquired by applications sent to and accepted by this company in Jacksonville, Florida. There were no regular Times-Union reporters in Louisiana, no office, place of business, agents or employees in the state; no regular advertising agents were retained in Louisiana; all advertising—an extremely small percentage—that originated in Louisiana was accepted in Florida.

The Des Moines Town Register (Des Moines Register and Tribune Company) is edited, published and distributed principally in the State of Iowa; it has no registered or authorized agents, representatives or employees within the State of Louisiana. This company did not solicit business for subscriptions or advertising in Louisiana during the years 1960, 1961 and 1962. The five subscribers in Louisiana during those years made their applications by mail to the newspaper company in Des Moines, Iowa. For the year 1962 the only advertising by this company that was received from Louisiana was four inches from the New Orleans Spring Fiesta.

 The law is well settled that the mere circulation of a periodical through the mails to subscribers and independent distributors constitutes neither doing business nor engaging in a business activity. Street & Smith Publications v. Spikes (5th Cir. 1941), 120 F.2d 895, cert. denied 314 U.S. 653, 62 S.Ct. 102, 86 L.Ed.2d 524; Insull v. New York World-Telegram Corp. (7th Cir. 1959), 273 F.2d 166.

 The law is also clear that sporadic news gathering by reporters on special assignment and the solicitation of a small amount of advertising do not constitute doing business nor engaging in business activity. Whitaker v. McFadden Publications (1939), 70 App.D.C. 165, 105 F.2d 44. The principle of Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, to the effect that jurisdiction of any court to render an *in personam* judgment depends upon a *de facto* power over the defendant's person, and "presence" within the territorial jurisdiction of a court is a prerequisite to the court's being able to bind by judgment, has been changed by International Shoe and McGee only to the extent that "presence" does not mean actual presence in the ordinary sense but "presence" in the constitutional sense; this "presence" in the constitutional sense depends upon a finding from the facts that "minimum contacts," through a business activity, exist with the forum territory to a degree that the exercise of jurisdiction by maintenance of the case does not "offend 'traditional notions of fair play and substantial justice.'"

With an application of these legal principles to the facts concerning the busi-

ness activities in the State of Louisiana of these several newspaper companies during the years 1960, 1961 and 1962, it is evident that even the broadest view of the principles of International Shoe and McGee will not bring these activities within the "minimum contacts" rule. The "quality and nature" of the activities of these newspaper companies during the period involved was not "continuous and systematic"; to the contrary, these activities constituted at most a "casual presence" in the State of Louisiana; such is not enough to make it reasonable and just, and in conformity with the due process requirements of the Fourteenth Amendment, for the State of Louisiana to enforce against them obligations arising out of such activities. As the Supreme Court stated in International Shoe:

> "To require the corporation in such circumstances to defend the suit away from its home or other jurisdiction where it carries on more substantial activities has been thought to lay too great and unreasonable a burden on the corporation to comport with due process."

Since the District Court did not reach the merits of these cases, the motion of the Florida Times-Union, filed after submission and on September 18, 1964, asking that the case as to it be dismissed as moot upon the authority of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 is denied. An application of the rule that the Constitution delimits a state's power to award damages for libel in actions brought by public officials against critics of their official conduct and a judicial determination by this Court of the proposition—as now advanced by the Florida Times-Union—that the principle of New York Times v. Sullivan should be extended to candidates for public office, must await an appropriate case.

The several judgments quashing the service of process and ordering dismissal of these seven cases as made by the District Court for the Eastern District of Louisiana are each affirmed.

JOHN R. BROWN, Circuit Judge (dissenting in part and concurring in part):

I accept the Court's conclusion that the service of process here questioned satisfied the Louisiana Statutes which were intended to stretch the long arm of Louisiana as far as the Constitution would permit it to reach. Stanga v. McCormick Shipping Corp., 5 Cir., 1959, 268 F.2d 544; cf. Delray Beech Aviation Corp. v. Mooney Aircraft, Inc., 5 Cir., 1964, 332 F.2d 135. I likewise agree that, facing the inescapable federal question, the activities of the New York Herald Tribune, The Charleston Gazette, The Cincinnati Post and Times Star, The Commercial Appeal, Des Moines Town Register, and the Florida Times-Union were of such a minuscule nature that none meets the minimum contract standard.[1]

With respect to the New York Times, however, I am of the view that unless a newspaper is to get an immunity both as to service of process and, perhaps now as to substantive liability for a defamation, New York Times v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, the activities of this defendant were more than ample to satisfy these underlying federal notions of fair play. When, as is done in the Court's opinion, the Times' Louisiana business is expressed in terms of percentages, I must agree it looks very tiny and casual. But the fact remains that there was a substantial number of regular subscriptions and newsstand sales. Average circulation in 1962 for the daily Times was 391 and for its celebrated Sunday edition, 1784.

Although I am now bound, for whatever state was there involved in this early-post-Erie opinion, by Street &

---

1. In Walker v. Savell and The Associated Press, 5 Cir., 1964, 335 F.2d 536 [No. 20682, August 11, 1964], we rested our affirmance wholly on the state construction an application of the Mississippi process statute. We did not meet the federal question.

Smith Publications v. Spikes, 5 Cir., 1941, 120 F.2d 895, cert. denied, 314 U.S. 653, 62 S.Ct. 102, 86 L.Ed.2d 524, I cannot, in testing the federal constitutionality of this service, accept the proposition, as the Court now states it, that "[t]he law is well settled that the mere circulation of a periodical through the mails to subscribers * * * constitutes neither doing business nor engaging in a business activity." 338 F.2d at 474. Why does a newspaper exist? A newspaper exists to gather and disseminate news through the sale and distribution of its papers. It seems incongruous to me for the law to say that the regular, continuous solicitation of subscriptions for a price and the transmission of the papers through the mails either in response to such solicited subscriptions or for retail sale through distributors is not "doing business," nor "engaging in a business activity." That is the very reason for the newspaper's existence. Apart from some overriding protection of publishers because of First Amendment policies, I am sure that the law would regard those engaged in other phases of direct unsolicited mail sales of merchandise, such as neckties, hosiery, golf balls, insurance, art lessons, and the like, as both "doing business" and "engaging in a business activity." True, this still leaves the important element of the quantity because as to no one, should a few or isolated, casual sales or transmissions have such wide extraterritorial consequences.

But here the number of papers regularly sent into Louisiana is more than enough to avoid the apprehension that this is either casual or has not been done with some articulate purpose by those responsible for the publication and distribution of this great newspaper. More than that, the Times would be the first to insist that its influence is not to be measured by these infinitesimal percentages. Because it gathers its news worldwide and likewise disseminates its news worldwide, it has, and claims to have, an influence in the process of the creation of public opinion far beyond mere numbers. Thus, for example, within the State of

Louisiana, its editorial impact, and likewise its value to its advertisers, is not to be compared with a newspaper of the same circulation published in one of the rural parishes or cities of Louisiana. And considering the prodigious nature of its celebrated Sunday edition and the likely position of its Sunday subscribers in the political, economic and social life of Louisiana, its regular transmission of over 1700 Sunday Times reveals both a substantial business purpose on the part of the supplier and also a substantial demand on the part of buyers.

These subscriptions and these sales have been sought by the New York Times. The Times has collected money for these sales. This is its business. When it regularly sends into Louisiana this substantial volume of papers, both daily and on Sunday, it is engaged in the regular, repeated operation of its main business pursuits.

There is, of course, the problem of drawing the line. I agree with the Court that as to the other newspaper defendants, the line has not been crossed. Just where, between this point and that represented by the Louisiana activities of the Times, the demarcation is to be made, need not now be ascertained. It is enough to say that I am clear that the number of sales, daily and Sunday, are more than ample.

I therefore respectfully dissent as to the affirmance of the New York Times case.

## ON PETITION FOR REHEARING

Before BROWN and WISDOM, Circuit Judges, and JOHNSON, District Judge.

### PER CURIAM:

It is ordered that the appellant's Petition for Rehearing in the above-entitled and numbered causes be, and the same is, hereby denied.

JOHN R. BROWN, Circuit Judge:

I concur except as to New York Times.