**The NEW YORK TIMES COMPANY,**
**Appellant,**

v.

**Eugene CONNOR, Appellee.**

**No. 22362.**

United States Court of Appeals
Fifth Circuit.

Aug. 4, 1966.

T. Eric Embry, Birmingham, Ala., Thomas F. Daly, New York City, Beddow, Embry & Beddow, Birmingham, Ala., Lord, Day & Lord, New York City, Louis M. Loeb, Ronald S. Diana, Gene R. McHam, New York City, of counsel, for appellant.

James A. Simpson, Crampton Harris, Birmingham, Ala., James E. Simpson, Birmingham, Ala., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., of counsel, for appellee.

Before TUTTLE, Chief Judge, THORNBERRY, Circuit Judge, and LYNNE, District Judge.

THORNBERRY, Circuit Judge:

This case now makes its third appearance before this Court. It originated as a libel action against The New York Times and Mr. Harrison Salisbury, a staff member of The Times, arising out of the publication of Salisbury's article on Alabama racial conditions in the April 12, 1960, issue of The Times. Of the seven separate suits brought by various individuals, the only one to survive to this point is that of Mr. Eugene Connor, one of the then City Commissioners of Birmingham, Alabama. In order to fix the context of the present appeal, we shall briefly summarize the previous litigation.

Service on defendants was attempted under the substituted service of process provision of Alabama's "long-arm" statute, Ala. Code tit. 7, § 199(1) (1960),[1]

---

1. "§ 199(1). Service on nonresident doing business or performing work or service in state.—Any * * * corporation not qualified under the Constitution and laws of this state as to doing business herein, who shall do any business or perform any character of work or service in this state shall, by the doing of such business or the performing of such work, or services, be deemed to have appointed the secretary of state, or his successor or successors in office, to be

and upon The Times by service upon two "stringers," men who are not regular employees of The Times but who are paid on the basis of what they write. District Judge H. H. Grooms consolidated the seven actions for hearing on defendants' motions to quash service of process. Judge Grooms quashed service on the two stringers but upheld service under the long-arm statute. On interlocutory appeal from this action, this Court found that Alabama followed the "single publication rule" in libel actions —i. e., the injury occurs only at the place where the newspaper is printed. New York Times Co. v. Connor, 5th Cir. 1961, 291 F.2d 492, 494. The Court then concluded that service under the Alabama statute was improper for failure to satisfy the requirement of that statute "that the cause of action must have accrued * * * from some business or service performed in Alabama or from some act incidental to the performance of such business or service there." Id. at 496.

On remand, the plaintiffs dropped their actions against Salisbury and sought to amend their complaint to allege a cause of action arising out of the distribution of The Times in Alabama. The District Court dismissed the actions since the amended complaints presented "no new matter not heretofore ruled on, and embraced in the appeal heretofore taken in this cause." Some of the plaintiffs, including Connor, appealed this decision. Prior to argument on appeal, the Alabama Supreme Court announced its opinion in New York Times Co. v. Sullivan, 1962, 273 Ala. 656, 144 So.2d 25, rev'd on other grounds, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 2d 686, in which it concluded that:

"It is clear under our decisions that when a non-resident prints a libel beyond the boundaries of the State, and distributes and publishes the libel in Alabama a cause of action arises in Alabama, as well as in the State of the printing or publishing of the libel. * * *

"The scope of substituted service is as broad as the permissible limits of due process."

Id. at 670, 144 So.2d at 34. The Fifth Circuit's statement of the Alabama law in *Connor* was found to be "erroneous." Id. at 687, 144 So.2d at 51. In response to the Alabama decision, this Court vacated its earlier decision in *Connor* and remanded the case so that the constitutional questions raised by the parties could be decided upon a full record after trial on the merits. Connor v. The New York Times Co., 5th Cir. 1962, 310 F.2d 133, 135. This mandate was stayed pending the appeal to the United States Supreme Court of the *Sullivan* case.

The cause proceeded to trial on September 16, 1964. By the time the case went to the jury, the only plaintiff remaining in the case was Connor. The jury found that The Times made statements relating to Connor with "actual malice" and awarded the plaintiff $40,000 compensatory damages. On this appeal, The Times urges (1) that its subjection to the jurisdiction of the court under the long-arm statute violates due process and the First Amendment and (2) that the jury's finding of actual malice is not supported by any evidence.

## I. Jurisdiction under the Alabama Long-Arm Statute

Since the Alabama Supreme Court has found that the scope of the Alabama Long-Arm Statute is "as broad as the permissible limits of due process * * *," New York Times Co. v. Sullivan, supra, we must examine the facts to determine if The Times had the "minimum contacts" with the State that are a prerequisite to the constitutional exercise

the true and lawful attorney or agent of such nonresident, upon whom process may be served in any action accrued or accruing from the doing of such business, or the performing of such work, or service, or as an incident thereto by any such nonresident, or his, its or their agent, servant or employee. * * *" Section 199(1) was amended in 1961 (subsequent to this cause of action. Ala.Code tit. 7, § 199(1) (Cum.Supp. 1961)).

of power over it. Hanson v. Denckla, 1958, 357 U.S. 235, 231, 78 S.Ct. 1228, 1238, 2 L.Ed.2d 1283; McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223; International Shoe Co. v. Washington, 1945, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95; Buckley v. New York Times Co., 5th Cir. 1964, 338 F.2d 470, 473.

The New York Times Company is a New York corporation which publishes its daily newspaper in New York. It maintains no office, employees or agents in Alabama. Newspapers are mailed directly from New York to individual subscribers, independent wholesalers and retailers; orders are accepted or rejected in New York; and payment is due in New York. Staff correspondents, other than Salisbury, had visited Alabama on seven occasions during a period from April 1, 1959, to August 22, 1960. The Times sometimes purchased stories at a certain rate per word from independent correspondents located in Alabama who were regularly employed by other businesses. These reporters are known as stringers. During the period mentioned above, The Times paid Alabama stringers a total of $415. Five times during this period, Times employees visited Alabama soliciting prospective advertisers. Alabama advertising accounted for approximately $^{25}\!/_{1000}$ to $^{46}\!/_{1000}$ of 1% of the total Times advertising revenue. Average daily circulation in Alabama was some 395 copies out of a total approximate circulation of 650,000. Sunday circulation in Alabama was about 2,455 out of roughly 1,300,000. Alabama sales revenue accounted for some $^{23}\!/_{100}$ of 1% of the total sales revenue.

Harrison Salisbury, a staff reporter, was assigned to go to Alabama to write a "situationer," a story which describes the events taking place and their causes as distinguished from a particular news event. He spent five days in Alabama on this assignment and wrote the article in controversy while on a plane returning to New York.

These contacts are virtually identical to those discussed in Buckley v. New York Times Company, 5th Cir. 1964, 338 F.2d 470.[2] In *Buckley*, The Times had a daily circulation in Louisiana of 391 and a Sunday circulation of 1784. Id. at 475. Although the article involved in *Buckley* came from an Associated Press dispatch rather than a Times reporter as here, this factor does not serve as a basis for distinguishing the two cases. The Associated Press, an association of member newspapers, is as much an agent of The Times in this respect as is one of The Times' own news staff.

■ The Court in *Buckley* found that "mere circulation of a periodical through the mails to subscribers and independent distributors * * *" and "sporadic news gathering by reporters on special assignment and the solicitation of a small amount of advertising do not constitute doing business nor engaging in business activity." Id. at 474.

"[I]t is evident that even the broadest view of the principles of International Shoe and McGee will not bring these activities within the 'minimum contacts' rule.) The 'quality and nature'

---

**2.** The Court in *Buckley* provided the following summary of the Times' contacts with the State of Louisiana:

"The New York Times Company is edited and published in New York and *is sent directly to subscribers and independent distributors from New York.* The Times Company has no office or resident agents or employees in Louisiana of any kind. The only connections of the Times Company with Louisiana are: the sending of less than a thousandth of one per cent, in the aggregate, of its newspapers from New York to subscribers and to independent distributors in Louisiana; the occasional solicitation of advertising (an amount less than one thousandth of one per cent, in the aggregate) by traveling representatives; two such trips were made in 1960, three in 1961 and four in 1962; and the occasional sending of staff reporters to Louisiana on special assignments (there are no regular Times reporters in Louisiana); this occurred eight times in 1960, twice in 1961 and eleven times in 1962.

Id. at 473–474.

of the activities of these newspaper companies during the period involved was not 'continuous and systematic'; to the contrary, these activities constituted at most a 'casual presence' in the State of Louisiana; such is not enough to make it reasonable and just, and in conformity with the due process requirements of the Fourteenth Amendment, for the State of Louisiana to enforce against them obligations arising out of such activities."

Id. at 475. There can be no doubt that the facts as developed below are controlled by the holding in *Buckley*. For this reason, service under the Alabama Long-Arm Statute upon the New York Times must be quashed since the plaintiff has not established the minimum contacts necessary to sustain service on an out-of-state corporate defendant.

Our consideration would ordinarily conclude with the finding that the present case is controlled by the decision in *Buckley*; however, our attention has been drawn to a recent concurring opinion by a member of this Court, questioning the applicability of *Buckley* in Alabama. The Curtis Publishing Co. v. Birdsong, 5th Cir. 1966, 360 F.2d 344, 348 (May 10, 1966, concurring opinion, Rives, J.). In *Birdsong*, Judge Rives suggests that the Louisiana statute involved in *Buckley* is not as broad as the Alabama statute and notes that the Alabama Supreme Court has already concluded that the activities of The Times in circulating 390 daily and 2,500 Sunday papers constituted "doing 'any business' as that term is used in the Alabama long-arm statute." We believe, however, that *Buckley* cannot be distinguished nor restricted in this manner. The Court in *Buckley* treated the Louisiana statute as being as broad as the permissible limits of the due process clause—the same scope attributed by the Alabama Supreme Court and this Court to the Alabama statute. See New York Times v. Sullivan, 1962, 273 Ala. 656, 144 So.2d 25, rev'd on other grounds, 1964, 376 U.S. 254, 84 S.Ct. 710; [3] Elkhart Engineering Corp. v. Dornier Werke, 5th Cir. 1965, 343 F.2d 861, 865. Nor does the fact that the Alabama court has determined that the activity of The Times constitutes doing business under the Alabama statute limit the application of *Buckley* in Alabama. As we have noted, *Buckley* held that virtually the identical activity was not sufficient to establish the necessary "minimum contacts" under the due process clause. Since standards established in *Buckley* define the outer limit of the constitutional exercise of jurisdiction, they cannot be expanded by the Alabama Court's interpretation of its statute.[4]

The picture is further complicated by a recent decision of this Court construing the Alabama long-arm statute. Elkhart Engineering Corp. v. Dornier Werke, supra. Dornier, a German corporation, sold an airplane to Elkhart, a Wisconsin corporation, with the understanding that the plane, the only one of its type in the United States, would be available to Dornier for sales demonstration purposes. Pursuant to this agreement, Dornier sent a mechanic, a test pilot and its sales manager to demonstrate the plane in various parts of the United States. During a demonstration in Alabama, the plane crashed. Elkhart sued Dornier for damage to the aircraft in Alabama and served Dornier under the Alabama long-arm statute. Dornier contended that it was not doing business in Alabama such as to establish the minimum contacts sufficient under due process to subject it to service under the statute. The Court noted the broad in-

---

3. The Times asserted the jurisdictional issue in the United States Supreme Court, but that Court did not consider the point since under Alabama law The Times had waived its jurisdictional objection by entering a general appearance. Id. 376

U.S. at 264, n. 4, 84 S.Ct. at 717, 11 L.Ed.2d 686.

4. *Buckley* did not attempt to interpret the state statute involved, but assumed that the only limitation on the statute's application was the constitutional one.

terpretation placed upon the long-arm statute by the Alabama Supreme Court in *Sullivan* and concluded that:

> "Alabama may, consistent with the due process clause of the Fourteenth Amendment, assert jurisdiction over a non-resident, non-qualifying corporation in suits on a claim of liability for tortious injury arising out of activity of the non-resident within the state, even though only a single transaction is involved, and regardless of whether the activity is considered dangerous."

Id. 343 F.2d at 868. The Court did not make any reference to *Buckley*.

■ Thus, we are faced with a holding that the alleged commission of the tort of libel plus newspaper circulation and advertising solicitation within the state does not constitute minimum contacts under the due process clause (*Buckley*), while the tortious damage caused by a single airplane crash within the state does fulfill the minimum contacts requirement (*Elkhart*). This Court in *Elkhart* specifically rejected the possibility of drawing a distinction limiting jurisdiction to torts arising from "dangerous" activities since "[t]he concept of what is 'dangerous' is a slippery one at best, and in our view, the due process clause does not require such nice distinctions." Ibid. There is, however, a rational means of harmonizing the two decisions—First Amendment considerations surrounding the law of libel require a greater showing of contact to satisfy the due process clause than is necessary in asserting jurisdiction over other types of tortious activity. This is not a new proposition. Judge Brown suggested such a possibility in his dissent in *Buckley*. 338 F.2d at 476. Indeed, this Court in Walker v. Savell, 5th Cir. 1964, 335 F.2d 536, 544, approved such a distinction which Mississippi courts apparently follow "because of the inherent danger or threat to the free exercise of the right of freedom of the press if jurisdiction in every state can be inferred from minimal contacts. Cf. Sullivan v. New York Times, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686."

If this Court were to apply *Elkhart* literally to the commission of the tort of libel, newspapers with even one copy circulating within a state would conceivably be subjected to libel actions and the risk of large judgments at the hands of local juries incensed by the out-of-state newspaper's coverage of local events. In the face of this very real risk, could a publisher justify distribution of his product in any state where the size of his circulation does not balance the danger of this liability? Certainly, a mere 395 issues per day as involved in the instant case would not be sufficient. As the result, those people in the State of Alabama who wish to read a publication such as the New York Times would be deprived of this opportunity.

The Supreme Court dealt with an analogous situation in Grosjean v. American Press Co., 1936, 297 U.S. 233, 251, 56 S.Ct. 444, 449, 80 L.Ed. 660, in which a tax "with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers * * *" was found to be unconstitutional under the due process clause as an abridgment of the freedom of press. In this context, the Court stated that:

> "It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press.
>
> "The predominant purpose of the grant of immunity here invoked was to preserve an untrammeled press as a vital source of public information. The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridge-

ment of the publicity afforded by a free press cannot be regarded otherwise than with grave concern. The tax here involved is bad not because it takes money from the pockets of the appellees. If that were all, a wholly different question would be presented. It is bad because, in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties. A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves."

Another example relevant to the present problem is found in NAACP v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405, which involved the application of Virginia statutes regulating the legal profession and solicitation of business to the legal activities of the NAACP. In holding these activities to be modes of expression and association protected by the First Amendment, the Court noted that:

"* * * [t]hese [first amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."

Id. at 433, 83 S.Ct. at 338, 9 L.Ed.2d at 418. The Court observed that since the NAACP was engaged in unpopular activities "a statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression, * * * [and] [i]ts mere existence could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens." Id. at 436, 83 S.Ct. at 340, 9 L.Ed.2d at 420. See also Brotherhood of Railroad Trainmen v.

Virginia ex rel. Virginia State Bar, 1964, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89.

These two cases illustrate instances where First Amendment rights have been held superior in recognized areas of state regulation. The restriction on the exercise of jurisdiction over non-resident newspaper corporations imposed by *Buckley* should be viewed in the same light. It is not intended for the convenience of individual publishers; nor does it ignore the resulting inconvenience to victims of libelous publications of limited distribution in their state. Rather, it is a recognition that jurisdiction based upon minimal contacts similar to those in *Elkhart* when applied to the press will "limit the circulation of information to which the public is entitled in virtue of the constitutional guaranties" and will "freeze out of existence" the distribution on a limited basis of publications espousing unpopular positions in a particular locale. It is on this basis that *Buckley's* requirement of a greater degree of contacts to sustain jurisdiction over nonresident newspaper corporations continues to be good law alongside of *Elkhart*.

Nevertheless, since *Buckley* has been subjected to criticism and since these parties are now before this Court for the third time on matters involving the same piece of litigation, we deem it proper from the standpoint of judicial administration to consider the merits of this case.

## II. Proof of Malice

The article entitled "Fear and Hatred Grip Birmingham" by Harrison E. Salisbury appeared in the April 12, 1960, issue of The New York Times. As indicated by the title, it relates to numerous incidents of violence in Alabama and the suspicion and fear which is said to exist in Birmingham, and warns of the "growing fear that the hour will strike when the smoke of civil strife will mingle with that of the hearths and forges." [5] The article contains four references to Birmingham's Police Commissioner, Eugene

5. For the complete text of the article, see the Appendix.

Connor, which were submitted to the jury as allegedly libelous:

1. That under Birmingham custom persons charged with vagrancy are not admitted to bail and are held incommunicado for three days and that "this is a favorite technique" of Connor.

2. That Connor made a political comeback in 1958, "running on a platform of race hate."

3. That Connor once said: "Damn the law—down here we make our own law."

4. That Rev. F. L. Shuttlesworth "has been a frequent target of Mr. Connor's men."

After proper instruction by Judge Grooms, the jury concluded that "the statements made by The New York Times relating to the plaintiff [were] made with actual malice" and awarded plaintiff $40,000 in compensatory damages.

The record contains the following basically undisputed evidence about Mr. Salisbury's preparations and drafting of the portions of this article having reference to Connor: After receiving the assignment to go to Alabama to do a "situationer" describing racial relations in Alabama, Salisbury read clippings from The Times' "morgue" from the previous four or five days concerning racial developments in the cities he planned to visit. The Times' southern correspondent, Claude Sitton, gave Salisbury a list of names and sources for use in gathering information about Birmingham. Included on this list were Reverend Robert Hughes, a white minister and Connor. This was the first time Salisbury had ever heard of Connor. Salisbury was informed that The Times' stringer in Birmingham was John Chadwick. Upon his arrival in Birmingham, Salisbury met with Chadwick and received a list of names from him which included Rev. F. L. Shuttlesworth, a Negro minister, Dr. Henry K. Stanford, President of Birmingham-Southern College, Rabbi Milton Grafman of Birmingham's Temple Emanuel, and Albert Boutwell, Lieutenant Governor of Alabama. Salisbury personally interviewed all of these men. During the conversations with Chadwick, reference to several anecdotes about Connor were made to Salisbury. Salisbury had a long discussion with Rev. Hughes, and, at Hughes' suggestion, met with Clark Stallworth, a reporter for the Birmingham Post-Herald. Salisbury made three unsuccessful attempts to contact Connor during his visit to Birmingham. He also tried on several occasions to reach other persons recommended by Sitton and Chadwick.

The record contains the following evidence relating to the four allegedly libelous statements:

1. Statement that Connor approved or supported a custom of not permitting bail to persons charged with vagrancy and with holding them incommunicado for three days.

Salisbury testified that the source of this statement was Rev. Hughes, who informed him that this "was not an uncommon procedure" and that it was "a favorite technique of Mr. Connor." Specific reference was made to the recent treatment in this manner of a white seminary student. Hughes told Salisbury that his information, in part, was given him "by lawyer friends." Reverend Hughes was not called to testify.

Two witnesses and Connor testified that the statement was erroneous. Evidence was received that Birmingham previously had a "holding" ordinance but that Connor opposed it and secured its removal from the city code. Connor also referred to a system under which a report was filed every morning accounting for every prisoner held for a felony.

2. Statement that Connor campaigned on a platform of race hate.

The sources ascribed for this assertion were Rev. Shuttlesworth and Clark Stallworth. Neither of these men testified. Connor testified that he "still advocate[s] the supremacy of the white race," that he believes strongly in the doctrine of segregation, but denied that he campaigned on such a platform or that he hated anyone. Numerous witnesses for

the plaintiff stated that the statement was false.

3. Statement that Connor once said: "Damn the law—down here we make our own law."

Salisbury got this quotation from Shuttlesworth, and his notes taken during the interview show that the quotation was reported verbatim in the article. Connor denied making the statement, and numerous witnesses testified that they had never heard him make such a statement.

4. Statement that Shuttlesworth was a frequent target of Mr. Connor's men.

The source, Shuttlesworth, informed Salisbury that he had been arrested three times within a 72-hour period, that his phone was tapped, and that he had many cases on appeal.[6]

■ As evidence of malice, Connor contends that the article reports opinions as fact, that Salisbury relied on comments made by participants on one side of an active racial conflict without making any attempt to verify their stories, and that he failed to contact persons, including Connor, who could give the other side of the current racial difficulties. Soon after publication of the article, Connor demanded a retraction. The Times printed his letter along with a statement by one of its editors recognizing the failure of the article to:

"* * * stress the obvious fact that an overwhelming percentage of the citizens of that city lead happy and peaceful lives in a growing and prosperous community * * * [and] that this substantial element of the citizenry deplores any lawlessness that may exist in their city * * *. Should further investigation by The Times indicate that any statement in the Salisbury articles is incorrect or

inaccurate in any respect, The Times will publish an appropriate correction." Although the appellee admits in his brief that "a failure to retract cannot itself be treated as evidence of malice," he asserts that "publication of a statement that if an error had been made it would be corrected, and the failure to correct after, the jury could find, notice of falsity, is clear evidence of malice." [*sic*] Connor also points to the statement written by the Birmingham Chamber of Commerce and the Birmingham Committee of One Hundred at the invitation of The Times. This statement pictures the Salisbury article as "biased, warped and misleading" and states that:

"We do deny vigorously that the image presented by Mr. Salisbury is true, because it distorts and telescopes instances covering many prior years in an effort to provide a picture of the moment—a picture that is not true, even reasonably true.

"It is submitted that Mr. Salisbury made careless assertions and misstatements of facts regarding individuals. For instance, he took some innuendoes used in political campaigns against one of our public officials and treated them as facts. Indeed, the public official referred to has been a firm, effective police commissioner and the record conclusively shows that he does maintain law and order. He has also stated publicly that he will order the arrest of either white or Negro who makes moves likely to set off a racial incident." [7]

The appellee asserts "that there could be no more direct evidence of malice" than this statement of the Birmingham groups. The failure of The Times to qualify its "bold charge" after the Connor letter demanding retraction, The Times statement that if investigation re-

---

6. A random glance at the reporters indicates that Rev. Shuttlesworth has indeed been involved in extensive appellate litigation. See Shuttlesworth v. City of Birmingham, 1965, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176; Shuttlesworth v. City of Birmingham, 1963, 373 U.S. 262, 83 S.Ct. 1130, 10 L.Ed.2d 335; In re Shuttlesworth, 1962, 369 U.S. 35, 82 S.Ct. 551, 7 L.Ed.2d 548; Hanes v. Shuttlesworth, 5th Cir. 1962, 310 F.2d 303.

7. The N. Y. Times, May 4, 1960.

vealed the Salisbury article to be incorrect or inaccurate a correction would be published, and the statement of the Birmingham groups is said to be the equivalent of reckless disregard of the falsity of the publication.

 This case is admittedly governed by the legal standards enunciated in the recent Supreme Court case of New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686, since Connor is clearly a public official. As such, he is prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 279, 84 S.Ct. at 726, 11 L.Ed.2d at 706. The showing of malice may not be "presumed but is a matter for proof by the plaintiff * * *. [S]ince the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated' * * * we [must] 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.'" The Court concluded that "the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands * * *" and reversed the libel conviction. Id. at 284–286, 84 S.Ct. at 728–729, 11 L.Ed.2d at 709–710. Additional explanation of the actual malice standard is found in Garrison v. Louisiana, 1964, 379 U.S. 64, 74–79, 85 S.Ct. 209, 216–218, 13 L.Ed.2d 125, 132–135 in which the Court stated that:

"* * * since '* * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive" * * *,' only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be subject of either civil or criminal sanctions."

\* \* \* \* \* \*

"The test which we laid down in New York Times is not keyed to ordinary care; defeasance of the privilege is conditioned, not on mere negligence, but on reckless disregard for the truth."

██ When the evidence alleged to show malice in the instant case is measured against these standards, it is obvious that such evidence does not even approach the stringent requirements for showing actionable libel of a public official. Every challenged statement has been traced to an identified source. There is no evidence that any of the sources have denied giving the questioned information to Salisbury, that Salisbury twisted or misstated the information given him, or that Salisbury either knew or had clear grounds to suspect that the statements might be false. All that the evidence reveals is that Salisbury relied on one or two persons for each statement and that some of these people were actively involved in the events which were the subject of the article. This certainly does not constitute "reckless disregard for the truth." Although accuracy and objectivity in reporting are goals for which all responsible news media strive, the protection of the first amendment is not limited to statements whose validity are beyond question or which reflect an objective picture of the reported events. While verification of the facts remains an important reporting standard, a reporter, without a "high degree of awareness of their probable falsity," may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official.

Nor do we intend to intimate that The Times and Salisbury have merely followed the minimum course of conduct necessary to shield themselves from libel actions. On the contrary, they have exhibited a high standard of reporting

practices. Salisbury did contact persons representing different viewpoints and made a conscientious effort to interview Connor and others. Although one might disagree with the conclusions he drew from his information or his emphasis on certain facts rather than others, there is no evidence that he misquoted his sources or gave the information acquired from them a different slant than intended, as is so often done. The Times, although admitting its general editorial policy in favor of desegregation and Negro rights, did not hesitate to publish Connor's demand for a retraction, to acknowledge that the article did not stress the conditions and attitudes of the majority of the residents of Birmingham and to invite and publish a statement which would reflect views contrary to those voiced by Mr. Salisbury. Clearly these are not the actions of a sensation-seeking publication or of careless and shoddy reporting.

We now turn briefly to appellee's contention that actual malice is shown by The Times' failure to qualify the statements in the Salisbury article after the demand for retraction, the statement of the Birmingham groups and the promise by The Times to publish an appropriate correction if their investigation uncovered errors or inaccuracies in the article. The Supreme Court in *Sullivan* specifically held that "failure to retract * * * is * * * not adequate evidence of malice for constitutional purposes * * *" and expressed doubt "[w]hether, or not a failure to retract may ever constitute such evidence * * *." 376 U.S. at 286, 84 S.Ct. at 729, 11 L.Ed.2d at 710. In view of this holding and the evidence presented in this case, we conclude that The Times' failure to retract did not constitute evidence of malice.

The judgment of the District Court is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

## APPENDIX

### FEAR AND HATRED GRIP BIRMINGHAM

Racial Tension Smoldering
After Belated Sitdowns

**By HARRISON E. SALISBURY**
Special to the New York Times.

BIRMINGHAM, Ala., April 8—From Red Mountain, where a cast-iron Vulcan looks down 500 feet to the sprawling city, Birmingham seems veiled in the poisonous fumes of distant battles.

On a fine April day, however, it is only the haze of acid fog belched from the stacks of the Tennessee Coal and Iron Company's Fairfield and Ensley works that lies over the city.

But more than a few citizens, both white and Negro, harbor growing fear that the hour will strike when the smoke of civil strife will mingle with that of the hearths and forges.

It is not accidental that the Negro sit-in movement protesting lunch-counter segregation has only lightly touched brooding Birmingham. But even those light touches have sent convulsive tremors through the delicately balanced power structure of the community.

The reaction has been new manifestations of fear, force and error punctuated by striking acts of courage.

No New Yorker can readily measure the climate of Birmingham today.

Whites and blacks still walk the same streets. But the streets, the water supply and the sewer system are about the only public facilities they share. Ball parks and taxicabs are segregated. So are libraries. A book featuring black rabbits and white rabbits was banned. A drive is on to forbid "Negro music" on "white" radio stations.

Every channel of communication, every medium of mutual interest, every reasoned approach, every inch of middle ground has been fragmented by the emotional dynamite of racism, reinforced by

the whip, the razor, the gun, the bomb, the torch, the club, the knife, the mob, the police and many branches of the state's apparatus.

In Birmingham neither blacks nor whites talk freely. A pastor carefully closes the door before he speaks. A Negro keeps an eye on the sidewalk outside his house. A lawyer talks in the language of conspiracy.

Telephones are tapped, or there is fear of tapping. Mail has been intercepted and opened. Sometimes it does not reach its destination. The eavesdropper, the informer, the spy have become a fact of life.

Volunteer watchmen stand guard twenty-four hours a day over some Negro churches. Jewish synagogues have floodlights for the night and caretakers. Dynamite attempts have been made against the two principal Jewish temples in the last eighteen months. In eleven years there have been twenty-two reported bombings of Negro churches and homes. A number were never reported officially.

### Community of Fear

Birmingham's whites and blacks share a community of fear. Some Negroes have nicknamed Birmingham the Johannesburg of America.

"The difference between Johannesburg and Birmingham," said a Negro who came South recently from the Middle West "is that here they have not yet opened fire with the tanks and big guns.

"I have lived in Alabama all my life," said a newspaperman. "Birmingham is going to blow one of these days. And when that happens that's one story I don't want to be around to cover."

"Remember," a business man said, "Birmingham is no place for irresponsible reporting. Be careful of what you say and who you mention. Lives are at stake."

"I'm ashamed to have to talk to you off the record," said an educator. "It is not for myself. But these are not ordinary times. The dangers are very real and people up North must realize that."

"Excuse me," an educated Negro woman said. "But I just don't understand the white people around here. They seem to act so crazy. It doesn't make any sense. Don't they know there is a limit to what people will stand?"

"If you sow hate, you reap hate," said a Negro pastor.

The Birmingham of another era, that of the happy-go-lucky, ignorant Negro, the serio-comic dramas of Eighteenth Street (the Harlem of Birmingham), and the setting of Octavius Roy Cohen and his Florian Slappey stories, has vanished. Gone with it is Birmingham's fabulous Judge Abernathy, who let Negro prisoners determine the length of their stay in the Birmingham jail with a roll of the dice.

### Quiet in Early Phases

When the Negro student sit-in movement reached Birmingham ten days ago it set in motion a sequence of events almost reflexive in character.

Birmingham had been quiet during the early phases of the student protests. Two months ago a dozen Negro students went to a public park and began a brief "prayer for freedom." It was curtailed when the police arrested the students on a charge of public disorder.

Then on Thursday, April 2, ten Negro students went two by two into five downtown Birmingham stores. They made small purchases and sat at the lunch counters. All were arrested immediately on charges of trespassing. They were held eighteen hours before being able to make bond.

The next seventy-two hours were busy ones for the Birmingham police. They arrested three Negro ministers, the Rev. F. L. Shuttlesworth, the Rev. Charles Billups and the Rev. C. Herbert Oliver. Mr. Shuttlesworth was arrested twice on successive days.

The police also arrested Thomas Reeves, a 21-year-old white student at

Birmingham-Southern College and part-time preacher, and Jessie Walker, a Negro student from Daniel Payne University.

Each of those arrested was charged with "vagrancy." In addition, Mr. Reeves and Mr. Oliver, who was hauled barefooted and in his bathrobe from his home, were charged with "intimidating a witness."

By Birmingham custom, persons charged with vagrancy are not admitted to bail. They are held incommunicado for three days. In actual practice, such a prisoner is sometimes permitted to make one telephone call. But not always. A person arrested on a vagrancy warrant simply disappears for three days. His friends and family may not know what has happened to him.

### A Favorite Technique

This is a favorite technique of Birmingham's Police Commissioner, Eugene Connor. Mr. Connor is a former sports broadcaster known as "Bull" because of the timbre of his voice. He served as Birmingham Police Commissioner for sixteen years in the late Nineteen Thirties and Nineteen Forties. His administration was a stormy one.

He went into eclipse for several years but made a comeback in 1958, running on a platform of race hate.

"Bull is the law in Birmingham, like · it or not," a business man said.

Mr. Connor is the author of many widely quoted aphorisms. He once said:

"Damn the law—down here we make our own law."

On another occasion he declared:

"White and Negro are not to segregate together."

"Only legitimate hold-ups will be investigated," he announced after evidence had been uncovered that some Birmingham robberies were inside jobs.

Mr. Shuttlesworth has been a frequent target of Mr. Connor's men. He has three cases on appeal. His church has been bombed twice. In one bombing his home was destroyed. Both he and his wife were injured and a white pastor was badly manhandled by a Birmingham mob when the three of them sought to use the white waiting room of the local bus depot.

A test of the forces symbolized by Mr. Connor is now in the making—a product of the seismic Birmingham reaction to the Negro student sit-ins.

It centers on young Reeves. He is a slight youngster weighing about 137 pounds and standing five feet eight inches. He wears horn-rimmed glasses, suffers from asthma and is noticeably shy and diffident.

### Centers on Student

He has been charged by the police with "intimidating a witness." The witness presumably was one of the ten Negro students arrested for sit-ins.

The parents of young Reeves have received threats of death. The youth has been restricted to the campus of Birmingham-Southern, technically on administrative probation. Actually, the step is for his physical protection.

A cross was burned on the Birmingham-Southern campus, possibly because of the Reeves case, possibly because ninety-seven Birmingham-Southern students had signed a petition to Gov. John Patterson protesting his action in forcing Alabama College to expel Negro sit-in demonstrators. The petition did not protest segregation. It protested political interference with the academic process.

Dr. Henry King Stanford, president of Birmingham-Southern, has been subjected to extraordinary pressures. But he has not buckled under. He supported the right of his students to send their petition to Governor Patterson on the ground of academic freedom. When he was confronted with threats and demands that young Reeves be expelled he again stood his ground. He declined to prejudge the case.

### The Price of Courage

In Birmingham this kind of courage does not come cheaply. Dr. Stanford has been told that the college's position in the Reeves case will cost it a minimum of $1,500,000. This is the amount that the college had hoped to raise in a drive for badly needed building funds this year.

But as one Birmingham citizen said, "You weigh the situation. You take the counsels of caution. You listen to the voices which say don't rock the boat. But finally the time comes when a man has to stand up and be counted."

If fear and terror are common in the streets of Birmingham, the atmosphere in Bessemer, the adjacent steel suburb, is even worse.

On the night the Birmingham police arrested Mr. Shuttlesworth a band of floggers went to work in Bessemer.

The victim was a white woman, Barbara Espy, 19 years old, a former WAC. She was seized by four or five men, dragged into a car, beaten until she signed a confession that she had been "dating" Negroes.

She has since sworn out warrants charging that she was abducted and beaten by a sheriff's deputy, and alderman and three other persons.

The sheriff repeatedly refused to entertain charges against his deputy. The Federal Bureau of Investigation has been asked to look into the case for possible violations of civil rights.

One of the students who participated in the "prayer for freedom" lived in Bessemer. An evening or two later seven carloads of hooded men roared into the street where the youngster lives with his mother and sister.

Armed with iron pipes, clubs and leather blackjacks into which razor blades were sunk the men attacked the boy and his mother and sister. The mother and sister protected the boy with their bodies. The men broke a leg of the mother, smashed open her scalp and crushed her hands.

Forty-five minutes after the alarm had been given, the police arrived, but the band had fled. The next day two deputies visited the mother in the hospital. She recoiled in horror. They were two of those who had beaten her, she said. No charges were lodged.

"She is afraid to say anything," a man familiar with the case declared.

A year ago a Negro girl and a white girl, both elementary pupils, quarreled on the way to school. A white man emerged from a near-by house with a bull whip and flogged the Negro girl. The police failed to respond to a call from the Negro school principal.

For weeks Negro children had to go to school an hour early and were held in school an hour late so they would not come into contact with white children.

The list of beatings, intimidations and violence could be continued almost indefinitely.

But not everything goes according to plan.

At the height of the last week's tension the Harvard debating team came to town. It met in an open and publicly announced contest with the debate squad of Miles College, a Birmingham Negro school.

Whites and blacks talked from the same platform. Whites sat with blacks in the audience in violation of one of Birmingham's most cherished ordinances. No policemen appeared. It could not have been more normal or peaceful had the contest been held in Cambridge, Mass.

### Hearing Postponed

Special to the New York Times.

BIRMINGHAM, Ala., April 11—The Reeves case came up tonight in Recorder's Court and Judge **William Conway** postponed a hearing for four weeks "in order to give the police more time for investigation."

LYNNE, District Judge, (dissenting):

In my opinion the majority errs in concluding that it is bound by Buckley v. New York Times Co., supra, as being a case involving substantially identical facts. Apart from the demonstrable dif-

ference between the Louisiana statute involved in *Buckley* and the Alabama statute with which we are concerned,[1] the quality and nature of the activity of The Times within the two states were factually dissimilar.

In *Buckley*, the court examined the business activities of The Times within the State of Louisiana and found that its staff reporters were occasionally sent there on special assignments. However, the offending article in that case did not arise out of such an assignment trip. No member of its staff participated in gathering information for or in writing the article which was prepared solely by an employee of the Associated Press. With the ipse dixit of the majority that "[T]he Associated Press, an association of member newspapers, is as much an agent of the Times in this respect as one of the Times' own news staff", I disagree. Thus, the only connection The Times Company had with the State of Louisiana was the sending of the newspapers containing the article complained of into the state.

This case stands differently. The facts are undisputed that Salisbury, an admitted agent of The Times, spent five days in the Birmingham area interviewing people and gathering material for a "situation story." From notes jotted down during this time he prepared the preliminary draft of the article which became the basis of plaintiff's claim while on a plane en route from Birmingham to Newark, New Jersey. Clearly, the allegedly libelous article arose out of the newsgathering activities of Salisbury in Alabama.

In my opinion this direct relation between such activities and the cause of action provides a constitutional basis for in personam jurisdiction. In Interna-

tional Shoe Co. v. Washington, 326 U.S. 310, at 319, 66 S.Ct. 154, at 160 (1945), the Supreme Court stated:

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations *arise out of or are connected with* the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." (Emphasis added.)

In Elkhart Engineering Corp. v. Dornier Werke, 343 F.2d 861, 868 (5th Cir.1965), this court declared as follows:

"We therefore hold that Alabama may, consistent with the due process clause of the Fourteenth Amendment, assert jurisdiction over a non-resident, non-qualifying corporation in suits on a claim of liability for tortious injury arising out of activity of the non-resident within the state, even though only a single transaction is involved, and regardless of whether the activity is considered dangerous."

Substantially the same view is also expressed by the writers of the article Developments in the Law: State-Court jurisdiction, 73 Harv.L.Rev. 909, 926 (1960).

With gaze too foreshortened by concentration upon *Buckley*, the majority fails to come to grips with the highly relevant facts, present here but not there, that the alleged libel with which we are concerned not only is connected with but grew out of the calculated and directed activities of an accredited agent of The Times within the State of Alabama.

---

1. The distinction between the two statutes with reference to the efforts of the respective states to subject non-residents to in personam jurisdiction by extraterritorial service of process as limited by the due process clause of the fourteenth amendment, tested by the expanding con-

cepts from Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877) to McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) is graphically pointed up in Curtis Publishing Co. v. Birdsong, 360 F.2d 344 (5th Cir. 1966) (Rives, J., concurring).

These additional facts, in my opinion, distinguish this case from *Buckley* and provide a constitutional basis for the exercise of jurisdiction over defendant.

The majority seeks to shore up *Buckley* to the point of reconciling it with *Elkhart* by adverting to first amendment considerations. If such considerations underlie the opinion of the court in *Buckley* they are not articulated. It is of course true that " * * * freedom of the press, which [is] protected by the First Amendment from infringement by Congress, [is] among the fundamental. personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action." [2] And I would agree that application of the "doing any business" phrase of the Alabama long-arm statute to the distribution of periodicals by, or newsgathering activities of agents (unrelated to the asserted cause of action) in behalf of a nonresident, non-qualifying publishing company, either or both, to obtain in personam jurisdiction would be constitutionally impermissible. An attempt by a state to condition the right of such a company to distribute its publications or to gather news upon its submission to the jurisdiction of local courts would, in my opinion, constitute the imposition of a prior restraint of or a condition upon rights and liberties protected by the first amendment. Evident pragmatic considerations suggest that it might be equated with an effort by a state to levy a license tax on newspaper advertising [3] or by a city to forbid the distribution of literature without first obtaining written permission.[4] But the quality and nature of defendant's activities in this case convince me that the assumption of jurisdiction does not intrude upon first amendment rights and liberties.

Since the majority has concluded that the trial court was without jurisdiction, its ensuing discussion of the merits is frank dictum as to which I forbear any comment.

I respectfully dissent.

2. Lovell v. City of Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed. 949 (1938).

3. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

4. Lovell v. City of Griffin, supra.