CENTURY BRICK CORPORATION OF AMERICA *v.* CARROLL

No. 42668          May 20, 1963          153 So. 2d 683

*Keady, Campbell & DeLong,* Greenville, for appellant.

516

*Wroten, Orlansky & Miller,* Greenville, for appellee.

ETHRIDGE, J.

This litigation involves the question of whether the activities of a foreign corporation in this state were such as to subject it to service of process and jurisdiction of the local courts, within the concept of "doing business." The Chancery Court of Washington County overruled a motion to quash the process and to dismiss the suit, filed by defendant, Century Brick Corporation of America (called Century). It allowed an interlocutory appeal to settle the principles of the case. We affirm

the trial court, but an examination of the facts is necessary to resolve the issue.

I.

Curry C. Carroll filed this chancery action against Century, which is a corporation organized under the laws of the State of Pennsylvania, with its domicile and principal place of business in Erie. Century is the owner of a patented plaster technique, by which, with the use of a special tape, masonry materials are made to simulate brick in appearance. The bill charged that, pursuant to conferences in this state with a representative of Century, the latter sold Carroll, for a consideration of $4,950.00, a "franchise license" to use and promote in Washington and Humphreys Counties, Mississippi, Century's patented process. Carroll was to serve as a contractor, distributor, and dealer for the process and products of the corporation. The bill charged that Century's representatives made several material misrepresentations of fact, upon which complainant relied; that they were false and were made for the purpose of inducing complainant to rely upon them, and purchasing the franchise license; and the franchise was, for those reasons, void. The bill asked the court to adjudicate the franchise was a nullity, to rescind it, and to order restitution to Carroll of the $4,950 he paid Century for it.

Miss. Code 1942, Rec., section 1437 provides that any nonresident corporation not qualified to do business in this state, which is doing business here, shall be deemed to have appointed the Secretary of State to be its agent for process. Two copies of the summons shall be served on the Secretary of State, who mails one copy to defendant. Code secs. 1438, 1439; see also sec. 5345. Since Century had not qualified to do business in Mississippi, this procedure was followed. Defendant, through its attorneys, appeared specially and solely for the purpose of objecting to jurisdiction. It moved to quash the serv-

ice of process and to dismiss the cause for lack of jurisdiction. Oral and documentary evidence was received in a hearing on the motion, which was overruled.

Century's only office is at Erie, Pennsylvania. It has no officer or agent living in Mississippi, and no telephone listing, bank account, warehouse, or storage facility in this state. It placed an advertisement in a Greenville newspaper relating to a business opportunity, and Carroll answered it by writing Century a letter on October 3, 1961, requesting further information. Shortly thereafter, Century, from Erie, wrote Carroll advising that in the near future "our District Manager will contact you and arrange for a personal interview. At the time of this interview, your qualifications and the operation of our business will be discussed in detail in an effort to select the individual most qualified to operate our business in that area."

Subsequently Carroll received a telephone call, placed at Jackson, Mississippi, from Henry Gardner, one of Century's salesmen. He arranged for a meeting with Carroll at a motel in Greenwood, Mississippi, at which Gardner explained the proposition in some detail. The next day Gardner called Carroll, and suggested he go to Louisiana to examine a similar operation in that state, and Carroll did. During the Greenwood meeting, Gardner explained that "we would set up a business here, and that they would send this organizer down, and he would set me up as a salesman and get me in business, get me two jobs."

On October 19, 1961, Gardner persuaded Carroll to sign an application for franchise. It gave his net worth, three references, and offered to pay $4,950 for the franchise. Gardner took Carroll's check for $950 with the application, and advised him "he knew in reason that my application" would be accepted, that "he could assure me it would be accepted in the Pennsylvania office." Subsequently he was notified of the acceptance,

and Carroll paid the remaining $4,000. Four days after date of application, Century issued a franchise to Carroll for Washington and Humphreys Counties, Mississippi.

Shortly thereafter, Paul B. Gress, a "franchise organizer" for Century, who did not live in this state, visited complainant in Greenville for the purpose of helping him get his franchise and the business organized. This visit, according to Carroll, lasted about two weeks, and, according to Gress, one week. During this period Gress conferred and worked with Carroll every day. They visited three banks in Greenville, at which Gress introduced himself, and Carroll (who had lived there only a short time) as being the franchise owner for that district. Gress, with samples, sought to persuade the banks to finance persons who purchased this type of masonry finish on their homes. Gress, along with Carroll, also talked to Leo LaBouve, a plasterer, to persuade him to do any contract jobs in application of the masonry finish, under Carroll's franchise. LaBouve said he had a long discussion with Gress about using this finishing material. He agreed to be the application agent for Carroll. He also discussed prices and profits for this work with Gress, who told LaBouve that he would set Carroll up "as a divisional dealer." LaBouve agreed to go to Erie and learn the process, but never made the trip.

Gress also took Carroll with him to see M. H. Ezell, a builder, to persuade Ezell to use the Century Brick process on his house. Gress and Carroll both discussed the matter with Ezell, measured his house, and gave him a price for putting the finish on it. Gress told Ezell any job he sold he would receive 15 percent of the sale price. Gress left a sample with Ezell, but he made no sales. Gress also visited with Carroll a local lumber company, to see whether it could furnish the materials needed for the process, and their prices. Car-

roll had never been in the building business, and knew nothing about it, so Gress conducted most of the conversations and negotiations.

During Gress's visit, he persuaded Carroll to sign a printed form of progress report to Century, stating that Gress had arrived on November 8, 1961, "to organize my Century Brick operation." While he was there Gress made certain that Carroll had the proper financing connections, was schooled in the actual sale of the brick process and hiring and training salesmen, established the nucleus of a sales force, and in general familiarized Carroll with operation of the franchise. However, the report stated that no contracts were concluded during Gress's visit. Gress furnished Carroll with some forms with which to order stationery and pamphlets for the operation. Century had over 200 franchise licenses issued in thirty-five states. It did periodic advertising in newspapers in Mississippi, and had three franchise licenses issued in this state, including the one to Carroll. Each was an exclusive license for a specific geographical area in the state.

Gress's testimony confirmed that of Carroll as to the visits and contacts they made together in Greenville, during his visit in November, 1961. Century maintained a training center in Erie, where it trained all applicators in the use of the process. It furnished its dealer with a pneumatic applicating machine, as a part of the agreement. It sold through the mail planters and room-dividers in this and other states. Gress said that Carroll had not "lived up to the agreement," and the franchise had been cancelled.

In addition to all of the above circumstances, the franchise license itself issued to Carroll shows a substantial amount of control by Century over the licensee. It granted to licensee the privilege to use Century's processes and methods in a named geographical area in this state, Washington and Humphreys Counties, and

was exclusive in that area. The licensee agreed to promote the trade name of "Century Brick" and to utilize any other trade names or trademarks in lieu thereof when and if requested to do so by Century. Carroll agreed to use the materials prescribed by Century, that they would be of good quality, and the work would be in accord with Century's processes and methods. Licensee agreed not to disclose any secret processes, except to the extent necessary. They remained the exclusive property of licensor.

If licensee devised an improvement in the process, he would make it available to Century without cost. Carroll paid $4,950 for the franchise, and agreed to pay a royalty of 5 percent of gross sales for the first year, with a minimum royalty during that period of $100 per month. Century reserved the right to raise the minimum royalty thereafter to an amount not exceeding $200 per month. Licensee was required to keep an accurate account of operations under the agreement, agreed to "render a full statement to Century of same in writing by the 15th day of every month covering the preceding month," and to pay then the royalties earned for the preceding month.

Century had the right to have a public accountant examine, not more than once a month, all books and records of licensee for the purpose of verifying royalty statements. If the examination disclosed an error in excess of 10 percent, Carroll must pay cost of the examination. He also agreed to render to Century a duplicate copy of every contract under the franchise by the 15th day of every month, covering the preceding month's business. Use by licensee of any scheme or device to avoid payment of royalties constituted a breach of the contract. Carroll agreed that the business would be known as "Greenville Century Brick Company." The franchise stated that licensee was an independent contractor, not an agent of Century; that Carroll would not

assign it without written consent. Carroll was required to produce a minimum gross sales of $25,000 for the first year, and Century reserved the right to increase the annual minimum to an amount not exceeding $50,-000 beginning the second year. Failure of the licensee "to maintain said minimum annual gross sales shall entitle Century to terminate this agreement . . ."

The license did not entitle Carroll to use the processes in "prefabrication of any items for sale." Century reserved that right. It was stated the agreement was to be governed by Pennsylvania laws, and the insolvency of licensee or failure for 30 days to pay any amount due Century for purchase of materials should terminate the agreement upon written notice. Paragraph 16 provided that if licensee breached any part of the agreement, and Century gave him written notice of it, the franchise would terminate unless licensee cured the breach within 15 days of the notice.

## II.

The phrase "doing business" has been applied interchangeably to three distinct legal problems. We are not dealing here with activity subjecting a foreign corporation to penalties unless it is licensed or qualified, or with activities subjecting it to local taxation. The third, pertinent category is activity subjecting a foreign corporation to service of process and jurisdiction of local courts. 2 Hornstein, Corporation Law and Practice (1959), sec. 581. This is the broadest of the three areas of "doing business." Davis-Wood Lumber Co., Inc. v. Ladner, 210 Miss. 863, 877, 50 So. 2d 615 (1951).

The "presence" and "implied consent" theories, generally fictional, were substantially superseded in International Shoe Company v. Washington, 326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95, 161 A.L.R. 1057 (1945). Under *International Shoe,* to comply with due process there must be certain "minimum contracts" with the

forum state, so that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." However, the activities in the state should be continuous and systematic, and give rise to the obligation or liability sued upon, although one of these latter circumstances may suffice. *International Shoe* was applied and further developed in Travelers Health Assn. v. Commonwealth of Virginia, 339 U.S. 643, 70 S. Ct. 927, 94 L. Ed. 1154 (1950), and McGee v. International Life Ins. Co., 355 U.S. 220, 78 S. Ct. 199, 2 L. Ed. 2d 223 (1957). Hanson v. Denckla, 357 U.S. 235, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958), held it is essential that there be some act by which the defendant has purposefully availed itself "of the privilege of conducting activities within the forum state, thus invoking the benefit and protection of its laws." Note, 73 Harv. L. Rev. 909, 934 (1960).

The first two cases were considered in *Davis-Wood*. They and *McGee* were applied in Jarrard Motors, Inc. v. Jackson Auto & Supply Co., Inc., 237 Miss. 660, 115 So. 2d 309 (1959). Jackson Auto sued in a Mississippi chancery court two Jarrard corporations, domiciled in Florida. It purchased in Pensacola, Florida certain foreign-made automobiles, but some of them were transported from Florida to Jackson in defendants' trucks. Complainant asserted it was a dealer in these cars, acting under a contract with the distributors. The court analyzed Jackson Auto's contract with Jarrard. It provided that at the end of each month the dealer should forward to Jarrard orders for the cars and a full record of sales. Their title would remain in Jarrard until receipt of the purchase price. Jarrard could change the price of the vehicles at any time on notice, and could discontinue the supply of any particular model. The distributor had the right to visit the dealer to inspect the premises and facilities, and to examine all records and inventories. The dealer agreed to maintain suitable personnel and

organization, in the opinion of the distributor; it would maintain sales premises and an adequate supply, as directed by the distributor, and would advertise the product as directed by the distributor. The distributor could terminate the agreement for cause by giving the dealer written notice.

The court concluded that "Jarrard possessed almost absolute control over the method and manner of doing business by the dealer, in this case complainants in the bill." Another factor was a statute requiring any non-resident distributor of motor vehicles, having a contract with a dealer in this state, to file it with the Secretary of State. Miss. Code 1942, Rec., Sec. 8072. Jarrard had not complied. "Under the facts of this case, coupled with" Jarrard's failure to file the contract, Jarrard was doing business in the state so as to subject it to service of process. The court discussed particularly Condon v. Snipes, 205 Miss. 306, 38 So. 2d 752 (1949), *Davis-Wood* and *McGee,* analyzing the latter in some detail. ██ ██ *Jarrard* held that whether a corporation is doing business in this state is a question dependent primarily on the facts of each particular case; and a less strict interpretation has been applied where the suit pertains to matters arising out of the transactions within the state. A controlling factor was that Jarrard "had to a large extent complete control and domination over the activities of complainants in the sale, furnishing parts, and repair of the automobiles."

*Jarrard* is substantially similar to the present case. The statute requiring filing of dealer contracts was a minor element. The determining factors were the delivery of vehicles in the state, and the dominant control of the dealer by the distributor, the nonresident corporation. Livestock Services, Inc. v. American Cyanamid Co., 142 So. 2d 210 (Miss. 1962), involved only soliciting salesmen and promotional work, and did not modify *Davis-Wood* and *Jarrard.*

Century engaged in much more than isolated acts within the state. Its representative, Gardner, came to Mississippi on at least two occasions for conferences with Carroll, persuaded him to sign an application for franchise and pay $950 as an initial payment. After acceptance, Gress came to Greenville for two weeks, engaged in detailed, business activities directed to development of the franchise, both for the benefit of Century and Carroll. He contacted builders, plasterers, lumber companies, banks, discussed prices, fees, commissions, and in general participated in and supervised the organization and initial operations of the franchise dealership in Greenville. Moreover, Century had issued two other similar franchises within the state. All three of them were for definite geographical areas. All of these factors were considerably more in quantity, quality and continuity than were those in *Jarrard*. In addition, the franchise license issued by Century to Carroll vested in Century a large amount of domination and control of Carroll's franchise operations within the state. He was substantially at the mercy of Century in the operation, with the full right in it to supervise his business operations, including his records, and with requirements of minimum gross sales and royalties, and a broad power of cancellation.

When all of these circumstances are considered, along with the fact that the local activities of Century in this state gave rise to the alleged liability or obligation, Century was "doing business" in this state, within the power of its courts to adjudicate rights and liabilities under the franchise license, and for the purpose of process. 2 Hornstein, sec. 584; 4 Am. Jur., Proof of Facts, Doing Business, p. 487. Certainly the maintenance of this suit does not offend "traditional notions of fair play and substantial justice." Century's contacts within this state were activities which were continuous and systematic, as contrasted with an isolated

act or acts, and gave rise to the liability or obligation sued upon. See also Scott, Jurisdiction Over Nonresidents Doing Business Within a State, 32 Harv. L. Rev. 871 (1919); Note, Foreign Corporations — State Boundaries for National Business, 59 Yale L. J. 737 (1950). ██ ██ There is no mechanical or quantitative test of doing business. We consider the quality and nature of the activities in relation to the fair and orderly administration of the law. ██ ██ Essentially the test is one of reasonableness in view of the nature and kind of defendant's local activities. Goodrich, Conflict of Laws, p. 216. ██ ██ The facts in this case fully meet these standards. The chancery court correctly overruled defendant's motion to quash the process and dismiss the suit. Hence its decree is affirmed. The cause is remanded for further proceedings consistent with this opinion.

Section 106 of the Mississippi Business Corporation Act, stating certain activities which do not constitute doing business here, did not go into effect until January 1, 1963; but even if effective, it would not change this decision. Miss. Laws 1962, ch. 235, secs. 106, 151.

Affirmed and remanded.

*Lee, P. J., and Arrington, McElroy and Rodgers, JJ.,* concur.