**Peter J. CASANO, Plaintiff,**

v.

**WDSU–TV, INC., Defendant.**

**Civ. A. No. 3882.**

United States District Court,
S. D. Mississippi, S. D.

June 1, 1970.

---

1. 20 C.F.R. § 404.703 (1969).

Walter J. Phillips, Bay St. Louis, Miss., Frank J. D'Amico, New Orleans, La., for plaintiff.

George Morse, Gulfport, Miss., for defendant.

## MEMORANDUM OPINION

NIXON, District Judge.

The plaintiff, Peter J. Casano, filed this action for libel in this Court against the defendant, WDSU–TV, Inc. to recover damages allegedly resulting from its television broadcasts on August 8, and August 13, 1969, emanating from its studios near New Orleans, Louisiana, approximately fifty miles or less from plaintiff's domicile in Pass Christian, Harrison County, Mississippi. The alleged libelous material was transmitted over the defendant's station (Channel 6) into its area of coverage. The plaintiff's domicile was within the area of dominant influence of the defendant's television station, and the telecast complained of was viewed by television audiences in areas within this Court's jurisdiction in the Southern District of Mississippi at the same time that it was viewed by television audiences in the New Orleans, Louisiana and other Louisiana outlying areas.

The broadcasts complained of were concerned essentially with an examination of conduct on the part of the District Attorney of Orleans Parish, Jim Garrison, a public official then seeking renomination on the Democratic ticket. Specifically, plaintiff charges that the defendant inferred that plaintiff was a "racketeer", a "Carlos Marcello-connected attorney" and that he owned property with one Leon Salloum, who was accused of possessing stolen property.

The defendant was served with personal process at its domicile or studio at 520 Royal Street in New Orleans, Louisiana within 100 miles of Biloxi, Mississippi where this action was commenced. In response, WDSU filed a Motion to Dismiss, contending that this Court lacks personal jurisdiction over it. By affidavit in support of its motion, the defendant, through its President, A. Louis Read stated:

(1) It is a corporation organized and existing under the laws of the State of Louisiana and maintains its offices in the City of New Orleans, Louisiana and its transmitter in St. Bernard Parish, Louisiana.

(2) It is engaged in the business of television broadcasting in the State of Louisiana and does not do business nor

has it qualified to do business in any other state or jurisdiction.

(3) It leases no office space and maintains no bank accounts or corporate books or records, and does not execute contracts in Mississippi.

(4) None of the officers or directors of WDSU reside in Mississippi nor does it have any mailing address or telephone listing in Mississippi.

(5) It does not pay any taxes in Mississippi, does not purchase supplies and equipment, and has no employees or manager therein.

(6) During the year 1969 it carried commercial announcements for eleven advertisers located on the Gulf Coast area of Mississippi and named these advertisers and their location as well as the name and location of the advertising agency involved. Four of these advertisers are located in Gulfport, Harrison County, Mississippi; one in Biloxi, Harrison County, Mississippi; two in Pass Christian, Harrison County, Mississippi; two in Ocean Springs, Jackson County, Mississippi, and one in Picayune, Pearl River County, Mississippi. Four of the advertising agencies which placed these advertisements are located in Biloxi and Gulfport, Harrison County, Mississippi. All advertisements were subject to the approval of the defendant's Vice President in charge of sales in New Orleans. Three of the Mississippi advertisers, Gulf National Bank of Gulfport, First National Bank of Biloxi and The Port of Gulfport, which is the Mississippi State Port facility, sponsored advertisements that were institutional in character and were carried in connection with programing of WDSU that related specifically to the Mississippi Gulf Coast. All other advertisements were aimed primarily at the New Orleans market, that is, were designed to induce Louisiana residents to avail themselves of the goods or services offered by the advertisements. All payments for advertising on WDSU other than those paid to its national advertising representative, are due and payable in New Orleans, Louisiana.

(7) Other than what may be owing to WDSU from time to time on account of advertising previously carried by it at the behalf of Mississippi advertisers or agencies, the defendant has no property or other assets located within the State of Mississippi.

(8) WDSU has no employees stationed in Mississippi nor does it employ "stringers" for the purpose of reporting on news events therein.

(9) The broadcasts of WDSU referred to in the Complaint filed herein were made in connection with an investigation of the conduct of the District Attorney of Orleans Parish, Louisiana and was a matter of significance primarily to the listening audience in New Orleans, Louisiana and vicinity. Every person mentioned in those broadcasts either resided or maintained an office in Louisiana.

(10) While the broadcast signals of WDSU can be received by a greater number of homes, the American Research Bureau (an independent market survey organization whose findings are heavily relied on by television advertisers) classifies 14,300 television-equipped homes in Mississippi as being within the "area of dominant influence" of New Orleans television stations, as compared with 402,400 such homes in the State of Louisiana, and constitutes less than 3.5% of all television-equipped homes within the area of dominant influence of New Orleans television stations.

(11) Of defendant's total advertising receipts in 1969, less than six tenths of one percent (.6%) was attributable to advertisers located in Mississippi. Less than half of that amount was placed with defendant directly from Mississippi, the remainder having been placed by advertising agencies in Louisiana and Texas.

(12) The plaintiff herein is listed in the yellow pages of the telephone directory for the Greater New Orleans area dated December, 1969 with two office numbers appearing.

On the other hand, by affidavit and supplemental affidavit as well as by his sworn testimony herein, plaintiff declared that:

(a) He was born in Gulfport, Mississippi on October 19, 1935 and is now a resident citizen of Pass Christian, Mississippi, wherein he is a registered voter and has applied for and been granted homestead exemption. He is a member of the Trinity Episcopal Church in Pass Christian and his son has been enrolled in Christ Episcopal School in Bay St. Louis, Hancock County, Mississippi for the past three years.

(b) That he is a licensed practicing attorney in Louisiana and a member of the Louisiana bar but not the Mississippi bar. He is involved in several businesses in Louisiana but none in Mississippi; that fifty percent (50%) of his time is devoted to the practice of law although he owns an interest in two hotels as well as a restaurant and some apartments. Nevertheless, his social activities are basically centered in the State of Mississippi where most of his immediate family live and reside. He does a considerable amount of his work in his home in Pass Christian from which he commutes to New Orleans each day and spends every weekend at home in Pass Christian.

(c) He owns an automobile which he uses for business which bears a Louisiana license tag, and he also has a Louisiana drivers license. His personal automobile has a Mississippi tag and his wife, who usually drives this vehicle, has a Mississippi drivers license.

(d) Plaintiff is a member of several social clubs in the Gulf Coast area, and belongs to only one club in Louisiana, namely, the New Orleans Athletic Club.

(e) That the defendant televises or broadcasts daily into the State of Mississippi, and the broadcasts which form the basis of this action were heard and seen by numerous acquaintances, business associates, relatives and friends of plaintiff, all of whom live and reside in the State of Mississippi.

(f) That the defendant's regular program and schedule are published in the Gulf Coast edition of TV Guide, and The Daily Herald, the principal newspaper published on the Mississippi Gulf Coast and in Harrison County. Each and every television cable company on the Gulf Coast regularly carries the programs of WDSU–TV (Channel 6).

(g) WDSU–TV, Inc. is one of the main television broadcasting stations on the Mississippi Gulf Coast and is frequently seen and heard by large segments of the community in which plaintiff lives and resides.

(h) The programs in question were televised in plaintiff's hometown in the State of Mississippi. He denies that they were of significance primarily to the listening and viewing audience in the New Orleans, Louisiana vicinity.

(i) The State of Mississippi has taken an interest in connection with the activities of the Cosa Nostra and/or Mafia as evidenced by a recent report of Mississippi's Lieutenant Governor Sullivan.

(j) The defendant frequently sends reporters and photographers into the State of Mississippi; also, that in every weather advisory broadcast both daily and nightly, weather reports for the State of Mississippi are given primarily for residents of the Mississippi Gulf Coast.

(k) In many of the broadcasts of the defendant, the States of Mississippi and Louisiana only are referred to as matters of local interest.

(l) The circulation of the defendant's broadcast in the State of Mississippi are substantial, it actively solicits advertising therein, and the purpose and existence of its involvement within the State of Mississippi is to exploit further the Mississippi market for financial gain.

(m) Many of the advertisers on the defendant's Channel 6 particularly solicit residents of the State of Mississippi, and particularly the Mississippi Gulf Coast area, and advertise free delivery to residents of the Mississippi Gulf Coast area.

■ Although this Court is of the opinion that the defendant herein has sufficient contacts with Mississippi to satisfy due process under the holdings in International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945); McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and Eyerly Aircraft Co. v. Killain, 414 F.2d 591 (C.A.5, 1969), it is necessary as Judge Goldberg stated in *Eyerly,* to take the specific measurements of Mississippi law to see if its "Long Arm" reaches as far as the Constitution permits. Although the decisions are not uniform, and some Courts have chosen to regard the amenability of a corporation to suit within a state as a matter of procedure, governed solely by a federal test, the sounder view, and that supported by the greater weight of authority, including the Court of Appeals for the Fifth Circuit, is that under the doctrine of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, in diversity cases, state law determines whether a corporation is subject to suit in that state, and the federal decisions are important only in ascertaining whether the state law is within constitutional bounds. Eyerly Aircraft v. Killain, *supra,* pp. 598, 599, f.n. 9; Walker v. Savell, 335 F.2d 536, 540 (C.A.5, 1964);

1 Barron & Holtzoff, Federal Practice and Procedure, Sec. 179, at 696 (1960).

Each case which raises an in personam or territorial jurisdictional question must be decided upon its own peculiar facts. Curtis Publishing Co. v. Golino, 383 F.2d 586 (C.A.5, 1967); Phillips v. Hooker Chemical Corp., 375 F.2d 189 (C.A.5, 1967); Republic-Transcon Industries, Inc. v. Templeton, 253 Miss. 132, 175 So. 2d 185 (1965); Jarrard Motors, Inc. v. Jackson Auto & Supply Co., 237 Miss. 660, 115 So.2d 309 (1959). However, the question for decision is not what the Mississippi Supreme Court has said in a case which is factually most in line with the one which must be decided, but what the Court has said with respect to the legal principles to be followed in any case involving the concept of "doing business." Walker v. Savell, supra, 335 F.2d at p. 541.

It is first necessary to examine Section 1437 of the Mississippi Code, 1942, Rec., both prior and subsequent to its amendment which became effective on July 1, 1964 and the Mississippi Supreme Court decisions construing and applying this statute which controls or governs the acquisition of jurisdiction over nonresident defendants, including foreign corporations, in the State of Mississippi, and which as amended is also referred to as the "Long Arm" statute.[1] Also, Section 1437 must be read

---

1. "(a) Any nonresident person, firm, general or limited partnership, or any foreign or other corporation not qualified under the Constitution and laws of this State as to doing business herein, who shall make a contract with a resident of this State to be performed in whole or in part by any party in this State, or who shall commit a tort in whole or in part in this State against a resident of this State, or who shall do any business or perform any character of work or service in this State, shall by such act or acts be deemed to be doing business in Mississippi. Such act or acts shall be deemed equivalent to the appointment by such nonresident of the Secretary of State of the State of Mississippi, or his successor or successors in office, to be the true and lawful attorney or agent of such nonresident upon whom all lawful process may be served in

any actions or proceedings accrued or accruing from such act or acts, or arising from or growing out of such contract or tort, or as an incident thereto, by any such nonresident or his, their, or its agent, servant or employee. The doing of such business, or the engaging in any such work or service in this State, or the making of such contract, or the committing of such tort in this State, shall be deemed to be a signification of such nonresident's agreement that any process against it which is so served upon the Secretary of State shall be of the same legal force and effect as if served on the nonresident at its principal place of business in the state or country where it is incorporated and according to the law of that state or country.

(b) All civil actions for the recovery of damages brought against a nonresident of

in conjunction with Section 5345 of the Mississippi Code of 1942, Rec.,[2] which specifically deals with jurisdiction over foreign corporations "doing business" in the State of Mississippi.

Prior to its amendment in 1964, Section 1437 contained no provisions for the acquisition of jurisdiction over nonresident defendants in cases where the commission of a single tort or execution of a single contract was the only contact which a nonresident had with the State of Mississippi. During that era the acquisition of jurisdiction rested primarily on whether the nonresident who had not qualified to do business in Mississippi and had not appointed a resident agent for service of process therein, was found to be "[doing] business or perform[ing] any character of work or service in this State." It was necessary to scrutinize the nature and extent of the particular defendant's activity to determine whether it was "doing business" within the meaning of this statute, and the only limitations placed on the reach of this statute were that the defendant must have certain "minimal contacts" with the State and the assumption of jurisdiction must not offend "traditional notions of fair play and substantial justice." See Davis-Wood Lumber Co. v. Ladner, 210 Miss. 863, 50 So.2d 615 (1951). An excellent discussion of the history of this jurisdictional prerequisite as construed by the Courts is found in the case of Walker v. Savell, 335 F.2d 536 (5th Cir. 1964). In *Walker* the Court considered and discussed the leading case of Lee v. Memphis Publishing Co., 195 Miss. 264, 14 So.2d 351, 152 A.L.R. 1428,

and four other important subsequent cases decided by the Supreme Court of Mississippi, namely, Davis-Wood Lumber Co. v. Ladner, *supra*; Jarrard Motors, Inc. v. Jackson Auto & Supply Co., *supra*; Livestock Services, Inc. v. American Cyanimid Co., 244 Miss. 531, 142 So.2d 210 (1962); and Century Brick Corp. v. Carroll, 247 Miss. 514, 153 So.2d 683 (1963), in order to determine what, if any, gloss had been put upon the Mississippi Court's opinion in Lee v. Memphis Publishing Co., *supra*, by the decision of the United States Supreme Court in the International Shoe Case, *supra*. The Court in *Walker* concluded that the Mississippi Supreme Court had not in any of these cases decided to supercede its own announced requirements by the more modern or liberal trend discussed in the United States Supreme Court's decisions of International Shoe and McGee v. International Life Insurance Company, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223.

 Immediately after the 1964 amendment to section 1437 became effective, enlarging the scope thereof, the Mississippi Supreme Court handed down its landmark decision in Mladinich v. Kohn, 250 Miss. 138, 164 So.2d 785 (1964). The Court referred to the amendment which had been enacted but had not yet become effective, and utilized this decision to lay down the ground rules for the application of the amended and broadened statute. See Miss. Defense Lawyers' Journal, "How Long the Arm", Vol. 4, p. 45 and 27 A.L.R.2d pp. 463–465. In this case the Court held that in order to subject a nonresident to

the State of Mississippi may be commenced in the county in which the action accrued or where the plaintiff then resides or is domiciled, except as otherwise provided by law. Service of process may be had in any county of the State where the defendants, or any of them, may be found, except when elsewhere provided by law for service upon the Secretary of State.

(c) The provisions of this act as they apply to an accrual of a cause of action will be in full force and effect as to any

such accrual if the cause of action accrued either before or after passage of this act."

2. "Any corporation claiming existence under the laws of any other state or of any other country foreign to the United States, found doing business in this state, shall be subject to suit here to the same extent that corporations of this state are, whether the cause of action accrued in this state or not."

jurisdiction in the State of Mississippi, in addition to the requirements that it have certain "minimal contacts" with the forum state and that assumption of jurisdiction would not offend "traditional notions of fair play and substantial justice," there were three other basic factors which must coincide, and these are: "(1) the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state; (2) the cause of action must arise from, or be connected with, such act or transaction; and (3) the assumption of jurisdiction in the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation." Effective July 1, 1964, Mississippi's "Arm" *apparently* became longer by the addition of two other bases for acquiring jurisdiction of a foreign corporation or entity, namely: (1) if it committed a tort in the state against a resident of the state, or (2) made a contract with the state resident, some part of which was to be performed in the state. Although the above three criteria were laid down in Mladinich v. Kohn, prior to the effective date of the amendment to section 1437, they have been retained as necessary and essential prerequisites to the acquisition of jurisdiction since that amendment and up to this date, as is apparent by reading subsequent decisions of the Mississippi Supreme Court. See Hilbun v. California-Western States Life Insurance Company, Miss., 210 So.2d 307 (1968); Breckenridge v. Time, Inc., 253 Miss. 835, 179 So.2d 781 (1965); Republic-Transcon Industries, Inc. v. Templeton, *supra.*

Either the jurisdictional arm of section 1437 as amended is not as long as it appears in its "legislative sleeve" or the Mississippi Supreme Court has shortened it by "judicial surgery" to a length shorter than the permissible constitutional reach. The landmark jurisdictional decisions of the Supreme Court show the extent to which states may go, consistent with due process, but due process does not compel the states to go this far if they do not choose to do so. 1 Barron & Holtzoff, Federal Practice and Procedure, Sec. 179, at p. 696. We thus are not concerned with the question of whether the statute as construed by the state court violates the due process clause of the Fourteenth Amendment of the United States Constitution. This latter question, as stated by the Fifth Circuit in Walker v. Savell, *supra,* 335 F.2d at p. 542, is controlled by the United States Supreme Court's decisions which show a continuing development from Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, to International Shoe, *supra,* and McGee, *supra.* In Walker v. Savell, the Fifth Circuit stated that there is no suggestion in its opinion in Mississippi Wood Preserving Co. v. Rothschild, 201 F.2d 233 (C.A.5, 1953), that the broadened scope of *International Shoe* had been adopted by the Mississippi Supreme Court as the Mississippi standard. Walker v. Savell, *supra,* 335 F.2d at 543. In view of the fact that it is not necessary for this Court in this diversity case to engage in "rational divination" on this question because of the clear decisions of the Mississippi Supreme Court establishing the above prerequisites thereto, it now devolves upon this Court to apply the facts as it finds them herein to the law in order to resolve the present jurisdictional question. See Collins v. Truck Equipment Sales, Inc., Miss., 231 So.2d 187 (1970).

The first question to be answered is whether the defendant herein, a foreign corporation, purposefully did some act or consummated some transaction within the State of Mississippi, that is, whether its television broadcasts complained of constituted purposeful acts which allegedly constituted the tort of television defamation or libel, or consummated some transaction in the State of Mississippi. If the answer to this question is

in the negative our inquiry would end and this Motion to Dismiss would be granted. On the other hand, if the answer is in the affirmative, then the second criterion of Mladinich v. Kohn would be satisfied, that is, the cause of action which forms the basis of this suit did arise from or is connected with this act or transaction. In this event, the remaining question would be whether the third necessary prerequisite is satisfied, that is, whether "the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation."

The defendant contends that under the principles laid down by the Mississippi Supreme Court in Forman v. Mississippi Publishers Corp., 195 Miss. 90, 14 So.2d 344 (1943), the alleged tort of defamation or libel must be considered to have occurred or accrued where the television broadcasts originated, in Louisiana, and not in the State of Mississippi. The Forman case dealt with the question of the proper venue in an action for libel against a foreign corporation qualified to do business in Mississippi and domiciled in Hinds County. The defendant published and first circulated its newspaper containing the allegedly libelous article in Hinds County, and the plaintiff filed suit in Sunflower County, Mississippi where the paper was later circulated. The Court held that under the applicable statute which requires venue in the County "where the cause of action may occur or accrue," the proper venue for libel by the publication of a newspaper is in the county where the paper is first published and circulated; that it would not assent to the principle which would multiply the causes of action by the number of its readers; and that since the gravamen of the offense is not the knowledge by the plaintiff nor the injury to his feelings but the degrading of reputation, the right accrued as soon as the paper was exhibited to third persons in whom alone such repute is resident, because at that time the tort is complete even though the damage may continue or even accumulate.

The defendant's reliance on *Forman* is misplaced, because, unlike *Forman*, although the television broadcasts in question originated in the defendant's studio in Louisiana, they were simultaneously beamed or transmitted into the homes of Mississippi residents, including those in plaintiff's hometown, and the homes of residents of New Orleans, Louisiana and outlying areas who were viewing Channel 6 in those areas. Thus, even under the test of *Forman*, the alleged tort was committed and the right accrued in Mississippi as soon as the programs were exhibited to all of the above viewers, which occurred simultaneously in Mississippi and Louisiana.

This Court is of the opinion that the transmission of a television broadcast via the airways is the purposeful doing of an act contemplated by *Mladinich*, particularly in this day and time, with extensive and effective transmission within and without the earth's realm and sphere. In this connection, Paragraph No. 13 of the Affidavit filed herein by the defendant through its President in support of its Motion to Dismiss, admits that there are 14,300 television-equipped homes in Mississippi within the "area of dominant influence" of New Orleans television stations, and of course, there are an additional number of television-equipped homes who receive Channel 6 in Mississippi outside the area of dominant influence. This Court therefore is of the opinion and finds that the first and second of the three essential prerequisites necessary to subject a nonresident to personal jurisdiction in the State of Mississippi are satisfied.

The next inquiry is whether the last and most difficult obstacle to the acquisition of territorial jurisdiction of a

nonresident in the State of Mississippi has been overcome, namely, whether the foreign corporation has had sufficient "minimal contacts" with the forum state so that its assumption of jurisdiction does not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of its activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. As previously stated, in making this determination the question for decision is not what the Supreme Court of the State of Mississippi has said in a case which is factually most in line with the one being decided, but what the Court has said with respect to the legal principles to be followed in any case involving the concept of "doing business". In this regard, each case must be decided on its own facts. A determination of when a nonresident publisher may properly be brought into the Courts of a state, involves, as do all due process examinations, the resolution of a broad question of policy. What "minimal contacts" with a state by such a publisher or broadcaster make it amenable to service of process is dependent to a large degree upon the equities of the situation. The question to be decided is whether the quality, nature and extent of the activities of the defendant in Mississippi were inconsequential, Breckenridge v. Time, Inc., 253 Miss. 835, 179 So.2d 781 (1965), or whether its business activity in Mississippi was and is calculated, ordered, and substantial. Curtis Publishing Co. v. Golino, 383 F.2d 586 (C.A.5, 1967) at p. 593. As the Fifth Circuit said in *Golino*, the ultimate goal is that justice prevail, and the courts' concept of what constitutes the necessary "minimum contacts" will be molded to meet the needs of justice; that is, in each case there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protec-

tions of its laws. Hanson v. Denckla, 357 U.S. 235, 251, 253, 78 S.Ct. 1228, 1238, 1240, 2 L.Ed.2d 1283, 1296, 1298. The "standard" adopted by the United States Supreme Court by which assertions of the jurisdiction over a nonresident corporation must be measured has been stated in *International Shoe* as follows:

> "Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" See Comment, Long Arm Jurisdiction over Publishers: To Chill a Mocking Word, 57 Colum.L.Rev. 342 (1967).

As the Fifth Circuit said in *Golino* at page 589, in applying the broad policy to specific facts, decisions are rendered which guide future tribunals in deciding similar questions as they arise, and in applying these principles, the basis of the prior decisions—a desire to effectuate the underlying constitutional policy—must always be kept in mind. This underlying policy must control the application of precedent, just as it must guide the creation of future precedents.

The principal cases relied on by the defendant in support of its Motion to Dismiss are Breckenridge v. Time, Inc., *supra*; New York Times Co. v. Connor, 365 F.2d 567 (C.A.5, 1966); Buckley v. New York Times Co., 338 F.2d 470 (C.A. 5, 1964); Curtis Publishing Co. v. Birdsong, 360 F.2d 344 (C.A. 5, 1966); and Walker v. Savell, 335 F.2d 536 (C.A.5, 1964). Another Mississippi Supreme Court case which at first brush would seem to support the movant's contention is that of Lee v. Memphis Publishing Co., 195 Miss. 264, 14 So.2d 351 (1943), in which a majority of the Court, en banc, held that the defendant Memphis Publishing Co., a Delaware Corporation, publisher of "The Commercial Appeal," a daily newspaper printed and published in Memphis, Tennessee, was not subject to

in personam jurisdiction in an action for damages filed against it in the Circuit Court of Webster County, Mississippi, accruing out of the publication and circulation of an alleged defamatory and libelous article, despite the fact that it had distributors in various vicinities of the State, part of whose contractual duties were to retain all purchases and increase the number of purchases of the newspapers and to sell and deliver the paper promptly to purchasers, newsboys and newsstands at the regular rates fixed by the paper. In addition, the defendant had salaried State District Circulation Managers located in Mississippi who among other things recommended the employment and discharge of distributors; it maintained and paid the rent on an office in Jackson, Mississippi where it kept a paid employee whose duty it was to gather state-wide news; it distributed 40,000 daily papers within the State of Mississippi which constituted almost 30% of its total circulation. The majority, citing cases, including many Federal cases, stated that although perfect candor constrained it to say that one's first reaction is adverse to the contention that the defendant was not "doing business" within the State of Mississippi; nevertheless, after an examination of the reported cases and consideration of the legal principles involved, to hold the defendant amenable to service of process in Mississippi would violate the "due process" clause of the Fourteenth Amendment by subjecting it to jurisdiction unless its business was of such nature and character as to warrant the inference that it had subjected itself to the local jurisdiction within the sense of doing business as defined by the decisions in the "Federal Supreme Court" in its application of that constitutional provision. It can thus be seen from reading this case that the Federal decisions on which it is based are not "the law" today. This Court, engaging in "rational divination," is of the opinion that the Mississippi Supreme Court would at this time overrule or refuse to follow this decision, even applying the less than liberal standards of *Mladinich* and its progeny.

The Mississippi Supreme Court case principally relied on by the defendant is Breckenridge v. Time, Inc., *supra*, in which the Court refused to exercise jurisdiction over the defendant under the State's amended "Long Arm" statute. The Mississippi Court held that when a nonresident defendant magazine publisher did not purposefully do any act or consummate any transaction in Mississippi, the photographs complained of showing plaintiff standing on a bridge above a swamp and allegedly jeering while a search was being conducted for the bodies of three civil rights workers who mysteriously disappeared in Neshoba County, Mississippi, were taken by an independent photographer in Mississippi, and the information used in the alleged libelous statements published with the photograph were obtained from news services and "stringers" who were not employees of the defendant, but who sold pictures and information to the publisher in New York, that the Mississippi Court, in view of traditional notions of fair play and substantial justice, would not assume jurisdiction of the case. The Court held that under the facts and circumstances of that case "the quality, nature, and extent of the activity of appellee in the forum state were at the most inconsequential. * * * Those minimal contacts which are a prerequisite to personal jurisdiction of the courts of Mississippi over a nonresident defendant are totally lacking as to appellee." The Court went on to state that certainly just any inconsequential contact with the state of the forum is not sufficient to support jurisdiction over a nonresident under the "due process" clause (citing Hanson v. Denckla; Buckley v. New York Times Co., and comparing Century Brick Corp. of America v. Carroll, 247 Miss. 514, 153 So.2d 683 (1963).

The defendant also places great reliance upon Buckley v. New York Times Co., *supra*, and New York Times Co. v. Connor, *supra*, as well as Walker v. Savell, *supra*. *Buckley* and *Connor* in-

volve libel actions against the New York Times—one by Buckley, a Louisiana citizen, and the other by Connor, an Alabama citizen. The opinion in *Connor* pointed out that the contacts in the case before it were virtually identical with those listed in *Buckley,* both Courts holding that on the facts before them, the respective state "Long Arm" statutes could not constitutionally be applied to the defendant. The contacts of The Times with Louisiana stated by the Court in *Buckley* were as follows:

"The New York Times Company is edited and published in New York and is sent directly to subscribers and independent distributors from New York. The Times Company has no offices or resident agents or employees in Louisiana of any kind. The only connections of the Times Company with Louisiana are: the sending of less than a thousandth of one per cent, in the aggregate, of its newspapers from New York to subscribers and to independent distributors in Louisiana; the occasional solicitation of advertising (an amount less than one thousandth of one per cent, in the aggregate) by traveling representatives; two such trips were made in 1960, three in 1961 and four in 1962; and the occasional sending of staff reporters to Louisiana on special assignments (there are no regular Times reporters in Louisiana); this occurred eight times in 1960, twice in 1961 and eleven times in 1962."

The following language from *Buckley* was cited and held controlling in *Connor:*

"The law is well settled that the mere circulation of a periodical through the mails to subscribers and independent distributors constitutes neither doing business nor engaging in a business activity."

*Walker* involved a libel suit by General Walker against the Associated Press, a mutual cooperative and nonprofit association formed to gather, collect and interchange news with its members. The defendant could neither sell nor traffic in such news items collected and interchanged, but distributed them only to its members. The cost of these services were apportioned among the members in the form of assessments. It had in the State of Mississippi at the critical point of time, five employees, four of whom were newsmen whose duties were to gather news items and forward them to New Orleans, Louisiana where they were approved or circulated, some of which were re-transmitted to Mississippi members of the Associated Press and used within the State of Mississippi. The other employee was a maintenance man whose duty it was to repair equipment needed by the defendant in disseminating its services in Mississippi and other states. The defendant did not advertise its service in Mississippi, kept no corporate books or records, did not execute any contract in Mississippi and did not make available to its members or other members in Mississippi any news items procured there until they were transmitted to offices outside the State of Mississippi for approval. The Fifth Circuit, in affirming the United States District Court for the Northern District of Mississippi, which dismissed this suit for lack of personal jurisdiction, stated the following:

"It may well be the policy of the state of Mississippi to require a much stricter showing of the doing of business within that state by a foreign newspaper like the Memphis Commercial Appeal, or a foreign news service like the Associated Press, before it is to be held amenable to local service in a libel suit than would be the case in a suit against an ordinary commercial corporation. We think there is reason for such a distinction because of the inherent danger or threat to the free exercise of the right of freedom of the press if jurisdiction in every state can be inferred from minimal contacts."

This Court is convinced that defendant's reliance on the above four cases is misplaced, as valid factual distinctions in the instant case require a different legal result. These distinctions are predicated upon basic differences between the business activities, purposes and

motivations of a publisher of a newspaper although one of wide circulation and great influence, as in *Connor* and *Buckley* and of a mutual cooperative and non-profit wire or news service as in *Walker* and a publisher of a national magazine as in *Breckenridge,* from the business activities, purposes and motivations of a television broadcasting company authorized to, and daily transmitting and beaming its signals or telecasts into a potential of 14,300 television-equipped homes in Mississippi within its "area of dominant influence," as is shown and established in Paragraph No. 13 of the defendant's President's Affidavit filed herein in support of its Motion to Dismiss.

Plaintiff places his primary reliance upon Curtis Pub. Co. v. Golino, *supra,* decided by the United States Court of Appeals for the Fifth Circuit in 1967, which affirmed the action of the United States District Court for the Eastern District of Louisiana, which denied the defendant's motion to dismiss plaintiff's action for libel to recover damages allegedly resulting from an article in the February 29, 1964 issue of The Saturday Evening Post entitled: "New Orleans: Cosa Nostra's Wallstreet—Crime in America: VI." The Court held that the defendant's reliance on *Buckley* and *Connor* was misplaced, in view of valid factual distinctions between those cases and the case before it. The Court reasoned that the existence of a newspaper, no matter how popular, depends primarily upon circulation in the vicinity of its publication and while circulation in other areas may well be welcomed, it is not critical to the newspaper's continued existence, and thus circulation beyond the vicinity of publication can be characterized as "secondary or passive circulation," in that it is a product of the publication's excellence, rather than of a business effort of active solicitation in all areas of the nation. On the other hand, a magazine publication itself, unlike a newspaper, is not prepared primarily for local consumption but rather for a nationwide audience, and the primary function of such a business is to sell as many magazines as possible in every state of the Union and to that end the corporation actively directs its business. The Court went on to state at page 591:

"The legal principle urged upon us by appellants would allow a publisher, fully aware of the strong possibility of resulting legal action, to print libelous matters directed at persons in distant localities, yet remain free from suit in such localities in spite of the pecuniary benefits gained in that very jurisdiction where it asserts it cannot be held legally accountable. A rule of law allowing such a condition would clearly not conform to the purposes behind the 'minimum contacts' due process requirement. Resolution of the due process issue in the field of extraterritorial jurisdiction involves consideration of many factors. Circulation is admittedly one of these factors when dealing with a national publisher, and we are unwilling to say with appellant that it can never be sufficient in itself to satisfy the constitutional test."

\* \* \* \* \* \*

" \* \* \* It is to the end of increasing circulation that all other facets of the business are directed. It is also the activity from which the alleged injuries in a libel action flows. Where, as here, the solicited circulation of a corporation's publications account for a relatively significant portion of the corporation's revenue, notions of fair play and substantial justice support the right of the state to require the corporation to answer non-frivolous claims arising out of its contacts with the state, even though it has managed to reduce its physical presence in the state to a minimum."

In Paragraph 14 of its president's affidavit, the defendant states that less than six tenths of one percent (.6%) of its advertisement income was attributable to advertisers located in Mississippi, and in Paragraph 13, states that the 14,300 television-equipped homes in Mississippi which

are within the "area of dominant influence" of New Orleans television stations compared with 402,400 such homes in the State of Louisiana, constitutes less than 3.5% of all television-equipped homes within the "area of dominant influence" of New Orleans television stations. In *Golino* the Court found that the circulation of appellant's magazines in Louisiana was less than 1%; and in his concurring opinion in Curtis Pub. Co. v. Birdsong, 360 F.2d 344, 352 (C.A. 5, 1966), Judge Rives pointed out that The Saturday Evening Post circulation in Alabama, which was approximately .008% of its total circulation sufficed to constitute active submission of the defendant therein to the benefits of Alabama's fruitful market place, and having accepted the benefits of the market place, could not complain that one of the fruits of the harvest was a lawsuit. The statistics showing the number of television-equipped homes in Mississippi, the percentage of 3.5%, and the .6% of the defendant's total advertising receipts attributable to advertisers located in Mississippi are somewhat deceiving inasmuch as they are subject to the following apparent variables. There are many more television-equipped homes and a much larger population in the metropolitan area of New Orleans itself than on the Mississippi Gulf Coast, and, when combined with other areas in Louisiana within the dominant influence of its television broadcasts, certainly would greatly exceed the number of television-equipped homes in the State of Mississippi within the area of dominant influence of its stations. Likewise, the percentage of advertisement receipts attributable to Mississippi advertisers is subject to the same variables. Percentages of sales can be expected to slightly exceed population figures in areas of relative economic affluence and lag behind in the poorer sections, as pointed out in *Golino*, 383 F.2d at page 591. It can thus hardly be doubted that the defendant herein considers its audience and its advertisers in Mississippi to be a significant portion of its business, that is, as much as could be reasonably expected from the Mississippi market. An increased or larger viewing audience produces increased revenues from advertisements, as is so vividly indicated by the "poll taking" by television stations and networks and which has so often resulted in the "life" or "death" of various television programs. The facts of the instant case are even more distinguishable from those in *Connor* and *Buckley* than were those in *Golino*, and more strongly support the denial of the defendant's Motion herein.

It is to the end of increasing its viewing audience that all facets of the television business are directed. This is also the activity from which the alleged injuries in a libel action flow. The defendant is one of the main television broadcasting stations broadcasting or televising its pictures to television viewers in the southern part of Mississippi, and more particularly along the Mississippi Gulf Coast where plaintiff resides; its programs are frequently seen and heard by large segments of the community in which the plaintiff lives and resides. Every week, or almost every week, one of the "Midday" programs telecast by the defendant is devoted to some aspect of life on the Mississippi Gulf Coast, and frequently, residents of the Mississippi Gulf Coast appear on said program. In addition, weather reports deal with weather in Louisiana and in Mississippi and especially in the New Orleans and Mississippi Gulf Coast area. Political candidates in the State of Mississippi have utilized WDSU-TV or Channel 6 to reach the voting public within the State of Mississippi. Businesses, including large department stores in the City of New Orleans, directly appeal to residents of the Mississippi Gulf Coast in these telecasts, and many advertise free delivery service to certain areas of the Mississippi Gulf Coast. One actually offers free bus transportation to its store to certain Mississippi Gulf Coast residents. In many of the television broadcasts of the defendant, the States of Mississippi and Louisiana only are referred to when

dealing with matters of local interest or "local news"; the defendant television broadcasting corporation actively solicits advertising in the State of Mississippi, and has actively and fully exploited the Mississippi market for financial gain, the revenue it has derived therefrom which could not be considered inconsequential. The author of this opinion, at his home in Biloxi, Mississippi, often views WDSU-TV (Channel 6) because of its comprehensive news coverage, its editorials, and its frequent telecasts of matters of local public interest in Mississippi and particularly of the Mississippi Gulf Coast, which has been so often characterized as an outlying portion of New Orleans, not only because of its close proximity and contiguity thereto, but also because of the almost identical makeup, customs and moves of the citizens thereof. The business activity of the defendant in Mississippi therefore is calculated, ordered and substantial, and the fact that physical contacts are minimized does not alter the basic existence of it involvement in, and its peculiar benefit from, a full exploitation of the Mississippi market. The defendant could and can reasonably anticipate that the sale, distribution and promotion of its broadcasts and advertisements might entail libel actions, and that such actions will in all probability be brought in the places of residence of parties alleging injuries. Notions of fair play and substantial justice support the right of the State of Mississippi to require the defendant to answer nonfrivolous claims arising out of its contacts with the State, even though it has managed to reduce its physical presence therein to a minimum.

*Breckenridge* is certainly distinguishable on its facts inasmuch as all of the actions of the defendant therein were done through independent third persons, as distinguished from the direct television broadcasts into the State of Mississippi and particularly along its Gulf Coast by the defendant and particularly in view of its above activities. This Court does not quarrel with the principle of law laid down in *Breckenridge*, but distinguishes *Breckenridge* on its facts. The Mississippi Supreme Court in the above case found that to assume jurisdiction would be unreasonable and would offend traditional notions of fair play and substantial justice because the minimum contacts which are prerequisite to personal jurisdiction of the Courts of Mississippi were totally lacking therein because of the quality, nature and extent of the activity of the defendant in the forum state were at the most inconsequential. On the other hand, this Court, as stated above, finds the opposite to be true under the facts and circumstances of this case.

The defendant contends that the Fifth Circuit Court of Appeals in New York Times Co. v. Connor, *supra*, has ruled that in cases involving libel, First Amendment considerations require more than the usual amount of contacts before a state may acquire jurisdiction over a nonresident publisher, and therefore, that First Amendment consideration discussed therein compel the granting of this Motion to Dismiss. This Court disagrees with this contention, particularly because of the following language found in the *Golino* case decided one year subsequent to *Connor:*

"Certainly the language in Connor does not stand for the proposition that, because of the constitutional protection of the dissemination of ideas, a publisher may never be sued for libel in a state other than that of publication. Rather, Connor indicates that first amendment considerations are a factor relevant to a determination of the jurisdictional question; and, the discussion of that factor in Connor must be viewed in its factual context. * * * To argue that periodic lawsuits resulting from circulation of the Post will chill the desire of Curtis to actively encourage the widest possible circulation is clearly out of line with economic realities."

This Court has taken into account First Amendment considerations as a relevant factor, but does not consider them con-

trolling on the facts of this particular case. It would be economically unrealistic to assume that periodic lawsuits of this type will chill or discourage the defendant's broadcasts or telecasts of the news or its opinions. It must also be considered that the identical broadcasts or telecasts made to Mississippi viewers are also, at the same time, made to New Orleans and its outlying areas in the State of Louisiana within the dominant influence of the defendant's television station. The standards applied today to libel actions do not vary from state to state, but have, through decisions of the Federal Courts, and particularly the United States Supreme Court, become uniform. In truth and fact, the law of "libel," that is, the proof necessary to support a verdict for a plaintiff in a libel or slander suit concerning a matter of *valid public interest* requires clear and convincing proof of actual malice, in the absence of which, no jury issue is made of and no recovery may be had. Bon Air Hotel, Inc. v. Time, etc., 426 F.2d 858 (C.A. 5, May 6, 1970); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Time, Inc. v. McLaney, 406 F.2d 565 (C.A. 5, 1969), cert. den. 395 U.S. 922, 89 S.Ct. 1776, 23 L.Ed.2d 239; Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Wasserman v. Time, Inc., 424 F.2d 920 (D.C.Cir., 1970).

The concurring opinion of Judge Rives in *Birdsong, supra,* dealing with the issue of minimum contacts, is very apropos here:

"The teachings as to nonresident jurisdiction reveal several key principles. It is 'essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' * * * I submit that Post has actively submitted itself to the benefits of Alabama's fruitful market place just as much as did International Life with its single contract of insurance in the McGee case. Having accepted the benefits of the market place, it cannot complain that one of the fruits of the harvest was a lawsuit."

Fully mindful of the realization that the "minimal contact" doctrine of the State of Mississippi is not as liberal as that permitted by *International Shoe,* this Court nevertheless finds as a matter of fact and a matter of law that the defendant is "doing business" in the State of Mississippi within the meaning of the "Long Arm" statute of this State, as it is construed and applied by the Mississippi Supreme Court.

The requirement of defense of this case in Mississippi by the defendant is not viewed as a significant inconvenience to it because of the close proximity of New Orleans to Biloxi, Mississippi, where this Court sits, and the excellent highways connecting the two cities. According to plaintiff's affidavit, most, if not all, of his witnesses who will be called to testify at the trial are citizens of Harrison County, Mississippi. Furthermore, the requirement of defense in this jurisdiction is certainly not one that will hinder either the defendant's television broadcasting into the State of Mississippi or its other activities in this State.

Having considered all of the above factors, this Court is convinced that under the facts and the law, the defendant is "doing business" within the State of Mississippi, and this Court has constitutionally permissible jurisdiction over it herein. Furthermore, plaintiff is entitled to have his case tried in this forum, the place of his residence, particularly since the prerequisite to recovery in these type actions has been standardized or made uniform by the decisions of the Federal Courts, and particularly the United States Supreme Court.

Therefore, the Motion to Dismiss For Lack of Personal Jurisdiction will be denied, and the plaintiff may submit an Order to this Court in conformance with the above and foregoing opinion within the time and manner prescribed by the Rules of this Court.